IN RE INTEREST OF A.Z., B.Z., AND R.Z., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. S.Z., APPELLANT.
430 N.W.2d 901

Filed November 4, 1988.   Nos. 88-138, 88-139.

Thomas B. Thomsen, of Sidner, Svoboda, Schilke, Wiseman, Thomsen, Holtorf & Boggy, for appellant.

Dean Skokan, Dodge County Attorney, and Joe Stecher for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

S.Z., the natural mother of A.Z., B.Z., and R.Z., the children involved in these proceedings, appeals from orders of the county court for Dodge County, sitting as a juvenile court, which, on January 19, 1988, terminated her parental rights. The court found that S.Z. had failed to correct conditions which led to the determination that her children were juveniles as defined in Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1986). The parental rights of the children's biological fathers have also been terminated, but these terminations are not at issue in these consolidated cases. In addition, S.Z. has another daughter, L.M.; however, no petition has been filed seeking a termination of her parental rights with regard to this child.

The original petition regarding B.Z. and R.Z. was filed in December of 1983. The court adjudicated both as children defined under § 43-247(3)(a) (Cum. Supp. 1982), following evidentiary hearings on January 11 and August 1, 1984. The original petition concerning A.Z. was filed in December of 1984. On January 29, 1985, A.Z. was found to be a child as defined by § 43-247(3)(a). All issues in the above cases were consolidated for trial in the Dodge County Court. The issues in regard to all the children are identical; therefore, this opinion addresses all three children.

The appellant contends that the trial court erred in (1) finding that the State of Nebraska had proven by clear and convincing evidence the existence of circumstances described in subsection (6) of Neb. Rev. Stat. § 43-292 (Reissue 1984), and further finding that termination of parental rights is in the best interests of the children; (2) finding the State had met its burden of proving that S.Z. had willfully failed to comply with the provisions of a reasonable rehabilitation plan; and (3) finding the rehabilitation plan fundamentally fair and reasonable. In an appeal from a judgment terminating parental rights, the Nebraska Supreme Court tries the factual questions de novo on

the record, which requires the court to reach a conclusion independent of the trial court; however, where the evidence is in conflict, the Supreme Court considers and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of D.C.*, 229 Neb. 359, 426 N.W.2d 541 (1988); *In re Interest of M.R., J.R., and N.R.*, 228 Neb. 47, 420 N.W.2d 924 (1988).

The appellant also assigns as error a number of evidentiary rulings made by the court. Specifically, the appellant objects to the trial court's judicial notice of prior proceedings containing hearsay testimony and the testimony of witnesses regarding their opinion of whether S.Z.'s parental rights should be terminated, the ultimate issue in this action. The admissibility of this evidence does not affect our determination.

> The trial court's consideration of improper evidence does not, by itself, require reversal of a judgment terminating parental rights under the Nebraska Juvenile Code. Because factual questions concerning a judgment or order terminating parental rights are tried by the Supreme Court de novo on the record, impermissible or improper evidence is not considered by the Supreme Court.

*In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 266, 417 N.W.2d 147, 157 (1987).

The objection to taking judicial notice of prior proceedings is based on the argument that the prior proceedings contain hearsay, and therefore acceptance of them into evidence does not comport with procedural due process. See *In re Interest of J.S., A.C., and C.S., supra.* While it is true some inadmissible evidence is contained in the record of prior proceedings, in this case some testimony is not hearsay and is clearly admissible. Therefore, we will consider only the admissible evidence contained in the record of prior proceedings.

Social services for Dodge County has been involved in the lives of S.Z. and her children since 1977. The contact social services had with S.Z. which precipitated these proceedings was in July of 1980 in response to claims of neglect filed with Dodge County social services. A home visit was initiated, and the caseworker found the home very dirty and S.Z. exhausted. At

that time S.Z. had only two children. S.Z. moved to Missouri soon after, and the county was not involved again until June of 1981.

The 1981 contact was in response to complaints concerning lack of parental supervision. S.Z. had locked herself out of her trailer home and pushed L.M. through a window to get in. L.M. was badly cut. An emergency pickup order was issued, and L.M. and B.Z. were placed in foster care. At that point S.Z. cooperated with social services, and her children were returned home a month later. Social services maintained supervision and conducted a number of home visits. Conditions improved, and court jurisdiction was terminated in April of 1982.

R.Z. was born on May 10, 1983. In October, S.Z. voluntarily placed all three children in foster care due to a conviction for insufficient-fund checks. The children were returned to the mother when her incarceration ended 3 days later. One month later, further complaints were received regarding the family. L.M. alleged that her stepfather, who had just been released from incarceration after being convicted of sexually assaulting L.M., had again sexually assaulted her. The assault occurred when the mother allowed L.M. to ride unaccompanied with her stepfather to Hooper, Nebraska. When L.M. informed her mother of what had transpired between her stepfather and herself, S.Z. did not notify the authorities of the incident. L.M. then reported the incident herself, which resulted in emergency foster care for all of the children.

A hearing was held on November 30, 1983. The court returned R.Z. to the mother's custody, but L.M. and B.Z. remained in foster care. Both L.M. and B.Z. have remained in foster care since their placement in November of 1983. Unsupervised visitations were authorized through the weekend. S.Z. continued to have problems in caring for the children during the arranged visitations. Because of these problems, which included allowing the children to play outside in the winter without dressing them in winter clothing, visitation was restricted in a hearing held in March of 1984. This hearing resulted in visitation being reduced to only 4 hours on Saturdays.

In April of 1984, R.Z. was voluntarily placed in foster care by his mother, due to her poor health. S.Z. was pregnant at the time and was experiencing some complications.

S.Z.'s fourth child, A.Z., was born on April 21, 1984. S.Z. remained hospitalized due to bleeding ulcers, and A.Z. was placed in foster care. On May 11, R.Z. and A.Z. were returned to S.Z.'s custody. However, shortly thereafter foster care for R.Z. and A.Z. was requested by the mother, but this was only for 1 week in June of 1984.

In hearings held in August of 1984, the court began insisting on the development of a rehabilitation plan designed to reunite the family. At the first August hearing, psychological reports were received into evidence. These reports recommended continued foster care for the children. Connie DeBord, a caseworker for Dodge County social services, wrote a letter admitted into evidence at the second August hearing. She stated that she went to S.Z.'s home to discuss the development of a rehabilitation plan, but S.Z. refused to cooperate and threw objects about the room. On August 8, R.Z. was placed in foster care once again and has not since been returned to S.Z.'s custody.

A psychological evaluation of S.Z. was arranged with Dr. Ann Taylor in September of 1984. During the evaluation S.Z. became very argumentative and refused to cooperate, and finally Dr. Taylor asked S.Z. to leave her office. Because S.Z. displayed a violent temper, Dr. Taylor recommended that no one from Dodge County social services visit S.Z. without a law enforcement escort. Various visits were made and rehabilitation plans repeatedly ordered by the court. S.Z. continually refused to cooperate with any attempts to formulate a plan.

Finally, in December, 5 months after the court had begun attempting to formulate a rehabilitation plan with S.Z.'s assistance, the juvenile court ordered a comprehensive plan to be drafted, with or without the assistance of S.Z. The court then suspended all visitation until a rehabilitation plan was prepared and complied with.

On December 14, A.Z., S.Z.'s youngest child, was placed in foster care. This placement was made because of evidence of neglect. Specifically, there was evidence that S.Z. did not have a

sufficient amount of food on hand and that she had told a social services employee that she did not care whether A.Z. got any food. When the juvenile authorities arrived to pick up A.Z. for foster care, S.Z. became verbally abusive, screaming and grabbing the child from the social service workers. A juvenile officer present at the pickup testified that S.Z. was incoherent and shaking violently. In January of 1985, A.Z. was found to be a child as defined by § 43-237(3)(a).

Due to S.Z.'s lack of assistance in formulating a rehabilitation plan, the social services department compiled its own plan in January of 1985. S.Z. refused to sign a draft of the proposed plan. At a hearing in January regarding the proposed rehabilitation plan, S.Z. was asked if she would ever comply with a plan for rehabilitation. While testifying in answer, she was nonresponsive and often incoherent. At the January hearing, S.Z. was given 1 last week to prepare a plan of her own. A valid plan was not developed by S.Z. within the time specified.

A complete rehabilitation plan was established in a hearing held on February 27, 1985. During this session S.Z. was in an extremely agitated state, crying much of the time. One provision of the plan was no visitation until full compliance was achieved. The court insisted on this provision, as visitation in the past had been disruptive and even harmful. For example, when B.Z. was returned to his foster parents after one visitation, he was found to have a bead and popcorn imbedded in his ear canal. Additionally, Sandra Hudson, a foster parent for both B.Z. and L.M., testified that when the children were returned from visitations they were often inappropriately dressed for winter, often without underwear or socks.

In early 1985, S.Z. moved to Omaha. Further court proceedings followed, prior to any termination petitions being filed. S.Z. did comply with some terms contained in the rehabilitation plan. For example, the plan required her to establish a separate residence for herself, which she did for a time, and obtain employment, which she still maintains.

An evaluation was held on November 5, 1985, and a review hearing was held on March 25, 1987. At this time S.Z. no longer had independent living and was residing in shelters throughout

Omaha. Although visitation was forbidden by the court due to noncompliance with the rehabilitation plan, S.Z. had managed to have secret visitations with her children approximately three or four times in the 1½-year span between hearings. Because the rehabilitation plan adopted over 2 years ago had still not been complied with, the court denied any requests for visitation.

Termination proceedings were begun in July of 1987 regarding B.Z., R.Z., and A.Z. After the petitions for termination were filed, S.Z. was allowed limited supervised visitations. Evidence adduced at the termination proceedings clearly established S.Z.'s noncompliance with the rehabilitation plan. On January 19, 1988, the county court entered its orders terminating S.Z.'s parental rights to her children B.Z., R.Z., and A.Z., pursuant to § 43-292(6).

After an extensive review of the record in this case, this court is convinced that S.Z., after many attempts by social services to obtain compliance with a rehabilitation plan, has made little or no progress toward correcting the conditions which led to the initial determinations that her children were children as defined by § 43-247(3)(a).

The appellant, S.Z., has been under judicial jurisdiction for approximately 5 years. She has been under the supervision of Dodge County social services for over 10 years. For the last 3 years, S.Z. has been allowed no visitation, until termination petitions were filed by the State in July of 1987.

Section 43-292 provides:

> The court may terminate all parental rights between the parents [and a] juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

A juvenile court has the discretionary power to prescribe a

reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988). In this case a rehabilitation plan was established by the court. S.Z. has failed to even minimally comply with the established rehabilitation plan.

We have held that although the juvenile court is not required to implement a plan for rehabilitation, noncompliance with a reasonable plan presents an independent reason justifying termination of parental rights. *In re Interest of K.L.N. and M.J.N.*, 225 Neb. 595, 407 N.W.2d 189 (1987); *In re Interest of J.W.*, 224 Neb. 897, 402 N.W.2d 671 (1987); *In re Interest of L.H., supra.*

In *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 267, 417 N.W.2d 147, 158 (1987), we stated:

[R]egarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child.

The issues we are presented with are whether the rehabilitation plan is reasonable and whether the evidence supporting the termination orders is clear and convincing. We believe the record contains such clear and convincing evidence.

The appellant argues that the rehabilitation plan was unreasonable. The plan established by the court and the justifications for each point are outlined below.

"1. The mother shall take steps to establish financial and living independence i.e. apply for disability or Social Security Income Supplement, employment, or job skill training."

This provision was established in response to problems occasioned by S.Z.'s continuous poverty. In 1983, B.Z. and R.Z. were voluntarily placed in foster care due to a conviction for insufficient-fund checks. Lack of funds was a contributing factor in the appellant's inability to provide a stable and healthy

environment for the children. The court did not require financial independence, but merely expected her to take steps to secure some financial stability. The appellant did obtain employment, but has not achieved any living independence over a 3-year period. Basically, the appellant has a pattern of moving from one charity shelter to another or staying with friends. Appellant appears no closer to this goal than she was in February of 1985.

"2. The mother shall obtain appropriate family planning counseling."

Although this may be seen as too little too late, it cannot be said that the court was unreasonable in ordering such a provision. When the juvenile petition was filed on behalf of A.Z., the appellant had given birth to four children. The oldest child, L.M., was born during appellant's first marriage. B.Z. was born during appellant's second marriage. The appellant has been unable to identify the father of R.Z. and identified A.Z.'s father for the first time at the termination hearing. The appellant has borne four children by four different fathers, at least one of whom remains unidentified. The appellant has obtained no family planning counseling.

"3. The mother shall receive counseling as long as deemed necessary by an approved counselor. Costs to be paid by the Court or the Dept. of Social Services."

The mental health of the appellant has been a concern to all parties involved in this case. The testimony of S.Z. during these proceedings evidences a continued decline in the ability of the appellant to think rationally. Her responses were often totally inappropriate, and she cried and spoke incoherently throughout. When an appointment was made for counseling with Dr. Taylor, S.Z. was abusive and uncooperative and had to be asked to leave. S.Z. failed to establish the counseling she has repeatedly demanded to arrange for herself.

"4. The mother shall cooperate with a Social Services homemaker on learning appropriate parenting skills and for budgeting skills."

The appellant's home throughout these proceedings has been described as cluttered and very dirty. S.Z.'s home did improve for a time when a homemaker was assisting, but S.Z. later

refused to cooperate with a homemaker. As for her parenting skills, appellant repeatedly sought voluntary foster care for a break from parenting responsibilities. She stated that caring for the children often made her feel "cooped up." S.Z. would often have to request more food stamps at the end of the month as she could not make them last long enough to cover household expenses. Except for a short time after the 1981 complaints, S.Z. never did cooperate with a homemaker or seek budgeting assistance.

"5. The mother shall establish a separate residence for herself."

The noncompliance with this provision has been addressed in the above discussion of item 1 of the plan.

"6. The mother shall become active in and participate in an approved Parent Support Group."

L.M., the appellant's oldest daughter, has been the victim of repeated sexual abuse by her stepfather. This, along with other problems the appellant has had with her children, suggests the need for the appellant's participation in a parent support group, both to help the appellant develop an understanding for the needs of her children and to lend support to the appellant.

"7. The mother shall develop other support groups of her choice, i. e. church, appropriate friends, etc."

"8. The mother may contact the school(s) her children attend and counsel with the school representatives regarding any educational needs of the children."

These two points were included upon the request of the appellant. She cannot now argue that their inclusion was unreasonable.

The only provision of the rehabilitation plan seriously contested by the appellant is the denial of visitation rights until full compliance with the plan was achieved. There was evidence establishing that in the 2 years preceding the provision denying visitation the children were adversely affected by visitations. They would return to the foster parents agitated and neglected. When the foster parents would arrive to pick up the children and bring them back to the foster home, often S.Z. did not know where the children were and the foster parents would have to locate the children. Admittedly, this no-visitation

provision was quite harsh. However, even with the threat of no visitation with her children, S.Z. failed to comply with the other provisions in the rehabilitation plan.

In addition, we do not feel that it is now in the best interests of the children to go back and attempt to undo whatever hardship this provision placed on S.Z. It has now been over 4 years since B.Z. and R.Z. were last placed in foster care, and A.Z. has been in foster care since shortly after her birth. In that span of time the living conditions of the appellant have changed little. Her attitude has been uncooperative and remains so. She has done nothing toward seeking counseling for her unstable emotional state, nor has she sought help in improving her parenting skills, even when ordered to do so by the court. Therefore, we find it to be in the best interests of the children to affirm the order of the county court terminating the parental rights of S.Z. When parents cannot rehabilitate themselves within a reasonable time, the best interests of the children require that a final disposition be made without delay. *In re Interest of K.L.N. and M.J.N.*, 225 Neb. 595, 407 N.W.2d 189 (1987). The children have remained suspended in indefinite foster care awaiting a definitive decision concerning their future for too long. We cannot gamble with the future of these children any longer; they are entitled to a decision resolving their future. We hold the evidence supporting the court's termination orders to be clear and convincing. The decisions of the county court for Dodge County are affirmed.

AFFIRMED.