432 N.W.2d 834 (1988)
230 Neb. 646
In re Interest of E.R., J.R., and A.R., Children Under the Age of 18 Years.
STATE of Nebraska, Appellee,
v.
E.R. and B.R., Appellants.
Nos. 88-374, 88-375.
Supreme Court of Nebraska.
December 16, 1988.
*835 James H. Truell, Grand Island, for appellants.
Mark J. Young, Deputy Hall Co. Atty., for appellee.
HASTINGS, C.J., and BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
FAHRNBRUCH, Justice.
This is an appeal from two juvenile court orders terminating parental rights to three *836 small children because of substantial, continuous, or repeated neglect or refusal by the parents to give the children necessary care and protection, as required by Neb. Rev.Stat. § 43-292(2) (Reissue 1984).
The termination orders were entered only after extensive attempts at rehabilitation of the parents by the Department of Social Services (DSS). We affirm the juvenile court's orders.
In an appeal from a judgment terminating parental rights, the Nebraska Supreme Court tries the factual questions de novo on the record, which requires the court to reach a conclusion independent of the trial court. However, where the evidence is in conflict, the Supreme Court considers and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. In re Interest of A.Z., B.Z., and R.Z., 230 Neb. 291, 430 N.W.2d 901 (1988); In re Interest of D.C., 229 Neb. 359, 426 N.W.2d 541 (1988).
The children, E.R., J.R., and A.R., originally came under the jurisdiction of the juvenile court because they lacked proper parental care by reason of the fault or habits of their parents, who neglected or refused to provide proper care necessary for the children's health, morals, and well-being, in violation of Neb.Rev.Stat. § 43-247(3)(a), (Cum.Supp.1986).
E.R., born September 20, 1984, and J.R., born March 15, 1986, were first removed from their parents' home on June 2, 1986. On that date, two Child Protective Services workers responding to a complaint "found the house to be in a very filthy condition." Large quantities of dirt and garbage were found in every room. Dog feces were found on the floor in various parts of the house, along with used feminine sanitary pads dragged from the bathroom by one of the parents' three dogs. Assorted kittens and a large number of flies also occupied the home. Dirty pots and pans cluttered the kitchen, including the floor, and there was virtually no food in the home.
At a hearing on June 24, 1986, the parents admitted that their home was not suitable when E.R. and J.R. were removed. Evidence at the hearing showed that the condition of the home had substantially improved between June 2 and 24, 1986. The children were returned to their parents, with DSS retaining legal custody.
Conditions in the home deteriorated, and the children were again removed, in August of 1986. A report prepared by the DSS family support provider in September of 1986 reflects that both parents exhibited poor hygiene. Both wore dirty clothing, at times for several days. The worker found the children dirty. They were wearing soiled diapers, which appeared to have not been changed for several hours. In the home, dried food was on the stove, sink, counters, table, and high chair. Liquid was found oozing from a box of rotting vegetables on the floor. The children were sitting near the vegetables.
Between August of 1986 and September of 1987, the parents received services from an independent living specialist, vocational rehabilitation services, marital counseling, and parenting classes. In addition, the parents received the services of a caseworker and family support worker as part of a rehabilitation agreement with DSS. The parents substantially complied with the terms of the agreement.
On September 17, 1987, A.R. was born. The condition of the home improved substantially, and E.R. and J.R. were returned to their parents on October 29, 1987. At this time, the caseworker offered additional services to ease the transition. This offer was refused. The caseworker made five home visits between October 29 and December 29, 1987. The conditions of the home worsened after October 29, and the parents were warned that their home was reaching an unacceptable condition. Additional services were again offered and refused.
On December 24, 1987, the home was very dirty. Dirty laundry covered the hallway, master bedroom, bathroom, and *837 baby's room. The smell of animal urine was overpowering, and a rotting potato was found under the Christmas tree. The mother was told that she must "correct this situation."
The caseworker again went to the home, on December 29, 1987, in response to an anonymous report that the house was very dirty. The caseworker described the condition of the house as "deplorable." The kitchen contained dirty dishes and counters. Food was sitting out. The refrigerator smelled of rotten food but actually had no food inside it. Soiled underwear lay over a toothbrush in the bathroom sink, and tools littered the bathroom floor.
The children's beds had food on them, and an open bottle of aspirin lay on their bedroom floor. E.R. was on the floor eating the aspirin. When the caseworker pointed to this dangerous situation, the mother's response was inaction. The caseworker took the aspirin from the 3-year-old.
The caseworker returned to the home later in the day and photographed the above-described conditions. A court order was obtained, and all three children were removed on December 30, 1987.
Subsequently, a motion was filed requesting the termination of the parents' rights in E.R. and J.R. A supplemental petition was filed at the same time, seeking termination of parental rights in A.R.
At the termination hearing, the State provided testimony from four individuals who had worked with the parents in attempting to reunite the family. The caseworker, family support provider, and independent living specialist testified that all of the knowledge they had to offer the parents had been provided. All had seen improvement and then deterioration in the condition of the home. These three witnesses each stated that the parents had the skills and understanding to keep their home clean. The parents' problems stemmed from procrastination, lack of motivation, and lack of self-discipline.
A marriage counselor testified that the dominant issues he discussed with the parents were those regarding the children. The couple disagreed on who was responsible for caring for the children. The father believed his wife was responsible for the housekeeping and childrearing. The mother wanted her husband's help. This problem was never resolved. The counselor did not know whether the parents had benefited from their sessions with him.
The only witness for the parents was the mother. She agreed that her home was in an unacceptable condition at the times the children were removed. The mother testified that she understood and could apply all that DSS had taught her. In order to keep her house in an acceptable condition, the mother would need 2 hours without the children each day. DSS is not able to provide that type of service, particularly on a long-term basis.
The juvenile court found that "the conditions [of the home] at the time of each removal were so substantial as to endanger the health and safety of each of the minors, as well as the health of any person residing on the premises." The parents' rights to their three children were terminated.
On appeal, the parents assign three errors, which may be stated as follows: (1) The trial court erred in permitting the caseworker to testify regarding a medical doctor's report on E.R. and J.R.; (2) the court erred in admitting psychiatric and psychological reports on the parents; and (3) there is insufficient evidence to sustain the court's finding that the best interests of the children required termination of their parental rights.
The appellants' first two assignments of error are well taken. At the termination hearing, the caseworker testified, over objection, that he recommended parenting classes, in part, because of a medical doctor's report. The report indicated that E.R. and J.R. suffered from "environmental deprivation." The doctor *838 who prepared the report was not called to testify, leaving the appellants with no opportunity to cross-examine him. Testimony regarding the doctor's report was clearly inadmissible hearsay, and appellants' objection should have been sustained.
The psychiatric and psychological reports were offered into evidence during the marriage counselor's testimony. The reports were admitted, over objection; however, it is not clear whether they were received for a limited purpose or for the court's full consideration. Again, the authors of the reports were not called to testify, and the appellants had no cross-examination opportunity. The State argues that the reports are admissible under Neb. Rev.Stat. § 27-703 (Reissue 1985), which states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Even if § 27-703 applies to this situation, an issue we do not decide, the State failed to lay the proper foundation for admission of the reports. The counselor was asked whether the reports were of a type he would rely upon in his counseling sessions. However, the counselor was not asked whether the reports were of a type experts in his particular field would reasonably rely upon.
Clearly, the testimony regarding the medical doctor's report and the psychiatric and psychological reports were inadmissible hearsay. However, the erroneous admission of this evidence does not require reversal of the case.
"The trial court's consideration of improper evidence does not, by itself, require reversal of the judgment terminating parental rights under the Nebraska Juvenile Code. Because factual questions concerning a judgment or order terminating parental rights are tried by the Supreme Court de novo on the record, impermissible or improper evidence is not considered by the Supreme Court."
In re Interest of A.Z., B.Z., and R.Z., 230 Neb. 291, 293, 430 N.W.2d 901, 904 (1988); In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 417 N.W.2d 147 (1987).
In determining whether there is sufficient evidence to sustain the trial court's termination of the parents' rights, we will not consider the medical, psychiatric, and psychological reports or the improper testimony of the caseworker.
An order terminating parental rights must be based on clear and convincing evidence. In re Interest of M.W.M., 221 Neb. 829, 381 N.W.2d 134 (1986); In re Interest of M.L.B., 221 Neb. 396, 377 N.W. 2d 521 (1985). Past decisions of this court make it clear that poor housekeeping, alone, is not a sufficient basis for terminating parental rights. In re Interest of M.W.M., supra; In re Interest of D., 209 Neb. 529, 308 N.W.2d 729 (1981). However, a primary consideration in a case involving termination of parental rights is the best interests of the children. In re Interest of M.W.M., supra; In re Interest of M.L.B., supra. Where, as here, "poor housekeeping" degenerates into a continuing health hazard, the best interests of the children require termination of parental rights.
Appellants assert that the children were removed from their home in August of 1986 solely because the mother had filed for divorce from her husband. The father had taken E.R. with him and had threatened to commit suicide or to remove E.R. from the state. As stated earlier, testimony showed that when the children were removed for the second time, the house had deteriorated to prior conditions. The uncleanliness of the house was discussed with the mother. It was the caseworker's testimony that the condition of the house, along with the father's threats, was the basis for *839 removal. It was not the divorce action but the father's reaction to it and the unsanitary conditions of the house that required removal of the children from the home. The unsanitary conditions of the house and the health hazard to the children by themselves justified the removal.
The testimony and exhibits presented provide clear and convincing evidence that the best interests of these children require termination of their parents' rights. The photographs of the house taken on December 29, 1987, are particularly graphic evidence of the unhealthy condition in which these children were forced to live. By that date, DSS had provided extensive training to the parents. The lessons were learned, and, from time to time, the skills were exhibited by the parents. The condition of the home on December 29, 1987, shows the parents' total lack of motivation to change their living patterns in order to protect the health and safety of their children.
The parents also argue that their rights in A.R. should not be terminated because there is no evidence that his health was endangered. This home is clearly an unsuitable place to raise children. For us to hold that it presents a hazard to the health of the older children, but not to that of the baby, would be absurd. "`"`[W]e will not gamble with the child's future.'"`" In re Interest of D., 218 Neb. 23, 29, 352 N.W.2d 566, 570 (1984) (quoting In re Interest of R.D.J. and K.S.J., 215 Neb. 724, 340 N.W. 2d 415 (1983)).
We find that the State has proved by clear and convincing evidence that the parents have substantially, continually, or repeatedly neglected all three children or refused to provide them with necessary parental care and protection. The orders of the trial court are affirmed.
AFFIRMED.