IN RE INTEREST OF P.D., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. C.D.C., APPELLANT.
437 N.W.2d 156

Filed March 24, 1989.    No. 88-478.

Susan K. Alexander, of Alexander, Alexander & Alexander, for appellant.

Donna S. Fegler, Deputy Adams County Attorney, for appellee.

HASTINGS, C.J., WHITE, CAPORALE, and FAHRNBRUCH, JJ., and COADY, D.J.

FAHRNBRUCH, J.

C.D.C., who admitted that her daughter, P.D., lacked proper parental care by reason of the fault or habits of C.D.C., appeals the termination of her parental rights.

The Adams County Court, sitting as a juvenile court, entered the termination order after C.D.C. failed to comply with conditions of court-ordered plans to reunite P.D. with her mother. We affirm the juvenile court's termination order.

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the trial court; nevertheless, where the evidence is in conflict, the Supreme Court considers and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988); *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988).

On September 18, 1985, upon receipt of a court order, the Nebraska Department of Social Services (DSS) took P.D. into protective custody. P.D. was 4 months old at the time. At the protective custody hearing, a Hastings police sergeant testified that C.D.C. had left P.D. with a babysitter. When C.D.C. failed to return for her daughter after several hours, the babysitter was concerned and called DSS. The child was suffering from a fever and had been left without sufficient diapers and formula. The babysitter, knowing where the mother was, went to get C.D.C. and found her so "high" on marijuana that she was unable to comprehend her daughter's problems. The child had had but one bath in 2 weeks, and that was supplied by the babysitter. For about a week and a half prior to September 18, C.D.C. "had been going out and comin' home stoned about every night." When the child was placed in protective custody,

she "could have used a bath and (she) did have some bites about the face, several red spots. Could have been mosquito bites . . . ."

The petition filed on September 18, 1985, alleged P.D. to be a child as described in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984), in that P.D. was a child

"1. whose parent, guardian or custodian neglects or refuses to provide proper or necessary subsistence, education or other care necessary for the health, morals" or "well-being of such juvenile; [and]

2. who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile . . . ."

At a hearing on September 20, 1985, P.D. was placed in the temporary care and custody of DSS. C.D.C. did not attend that hearing, even though she had been personally notified by a caseworker. The mother moved from Hastings, Nebraska, to Arapahoe, Nebraska, after P.D. was removed from her custody. She told the caseworker that there were "no guarantees" that she would attend the hearing. C.D.C. did not visit the child until October 28, 1985.

C.D.C. was present with her court-appointed attorney at an adjudication hearing on December 13, 1985. At that hearing, C.D.C. admitted allegations in an amended petition that P.D. was a child who lacked proper parental care through the fault or habits of her parent. The court ordered that the child remain in the temporary care and custody of DSS pending a return to her mother as soon as possible. As a factual basis for this order, the court found that C.D.C. was involved in heavy use of marijuana and was under the influence of marijuana on numerous occasions in the presence of P.D. and that on September 18, 1985, C.D.C. had absented herself from P.D. for several hours beyond her scheduled return, that C.D.C. refused to attend to the needs of her child when specifically requested, and that she was under the influence of marijuana at that time.

P.D. was returned to her mother on December 31, 1985. On that date, C.D.C. voluntarily agreed to a reunification plan designed by DSS. The plan was neither approved nor ordered by the court.

C.D.C. made acceptable progress and was in compliance with the plan until April 22, 1986. At that time, C.D.C. moved to Alabama. DSS refused to allow P.D. to move with C.D.C. until a home study was completed by the Alabama department of social services. The child was placed at an emergency shelter for children and in a foster home in June of 1986. C.D.C. returned to Nebraska in September of 1986, but did not contact DSS until at least 2 weeks after her return. Between April 22 and October 1 of 1986, C.D.C. did not attempt to communicate with her child in any way.

The court entered the first of three court-approved rehabilitation plans at a review hearing on December 12, 1986. That plan required C.D.C. to (1) secure and maintain adequate housing for at least 6 months, (2) maintain employment for 6 months or enroll in a school program and have regular attendance, (3) complete a parenting class, (4) maintain weekly visits with P.D., and (5) cooperate with the family support provider. Originally, the plan required C.D.C. to provide transportation and a baby car seat for her visits with P.D. However, C.D.C. refused to provide transportation even though she owned a car. The plan was amended by the court so that DSS transported the child for visitation.

C.D.C. failed to successfully comply with this plan. In September of 1986, C.D.C. was living with her boyfriend in Juniata, Nebraska. In November, she moved in with J.S. in Harvard, Nebraska. C.D.C. claimed that J.S. was P.D.'s father. Both C.D.C. and J.S. moved to the home of J.S.' parents in Glenvil, Nebraska, in March of 1987. They returned to Harvard in April. At no time did C.D.C. live in her own home or provide financial maintenance for the home in which she did live.

C.D.C. did not seek employment. She did register for classes at a local community college and obtained $1,738 in federal financial aid. However, C.D.C. attended only two classes. A television, stereo, and other furniture were purchased with the financial aid. Scheduled weekly visits with P.D. were maintained. The parenting class was completed, and C.D.C. did cooperate with DSS workers.

Another case plan was ordered by the court in June of 1987.

The second plan again required C.D.C. to maintain her own home, obtain employment, and cooperate with DSS. C.D.C. was required to undergo a drug and alcohol evaluation and pay $15 per month in child support. Visits with P.D. were increased to four per week. C.D.C. was to provide transportation and a child car seat for two of the visits and DSS for two visits. The visits were scheduled to last from 10 a.m. until 4 p.m. A DSS worker was to supervise the Friday afternoon visitations.

C.D.C. failed to comply with the second plan. In June, C.D.C. and J.S. moved back to Glenvil and lived with J.S.' parents. In September of 1987, both C.D.C. and J.S. returned to Harvard. In December, C.D.C. moved to the residence of a friend in Hastings. C.D.C. did not seek employment and did not contribute to the maintenance of a residence. The drug and alcohol evaluation was not completed by the time of the next review hearing.

C.D.C. did maintain her visits with P.D. However, she again failed to provide transportation. Sometime in June of 1987, C.D.C. underwent surgery. She told DSS workers that she was not allowed to drive. A caseworker learned that C.D.C. was not to drive for 3 weeks. After the 3-week period, C.D.C. still refused to transport P.D. for visits. However, she was seen driving. She returned P.D. from her visits early several times. A child car seat was not provided by C.D.C.

Another review hearing was held in September of 1987. The court again ordered compliance with a rehabilitation plan prepared by DSS. This third plan again required C.D.C. to maintain her own residence and obtain employment. C.D.C. was also required to pay child support and submit a budget to DSS. The plan again included the drug and alcohol evaluation and ordered C.D.C. to follow recommendations of the counselor, and ordered family counseling with C.D.C. and P.D. attending together. Visits with P.D. were reduced to one per week and were to be supervised. The reduction was the result of P.D.'s illness, C.D.C.'s failure to administer medication, a bruise that appeared on P.D.'s neck after one visitation, and the fact that the child became "real stressed" when there were four visits per week. In addition, the lack of bonding between mother and child did not improve with four visits per week.

C.D.C. was required to provide transportation and a car seat.

In September of 1987, C.D.C. was still living with J.S. in Harvard. She moved to Hastings in December and lived with a friend. In February of 1988, C.D.C. moved to the residence of other friends in Hastings. C.D.C. did obtain employment but only worked for 2 days. A budget was not submitted and child support was never paid. C.D.C. canceled a scheduled appointment with the family counselor and did not reschedule it. Weekly visits with P.D. were maintained, but C.D.C. refused to provide transportation.

The drug and alcohol evaluation of C.D.C. was eventually completed. Counseling was recommended, but C.D.C. did not follow through with that recommendation.

A supplemental petition requesting termination of C.D.C.'s parental rights in P.D. was filed September 17, 1987. A hearing was held in March of 1988. At that hearing, in addition to the facts heretofore set forth, those reports properly received in evidence and other admissible competent and relevant evidence of witnesses may be summarized as follows:

From the time of the adjudication hearing until she left the state to go to Alabama, C.D.C. made acceptable progress. Upon her return from Alabama, C.D.C. said she had been back in the state for "several weeks" before contacting DSS in September 1986. Upon C.D.C.'s return to Nebraska, her first visit with P.D. was October 1, 1986. C.D.C. failed to keep the second visit scheduled for October 10 and, in fact, did not again contact DSS until November 19 to schedule visits. In the interim, DSS could not locate C.D.C. On November 19, visits were scheduled to resume November 26, 1986. C.D.C. did not always provide diapers or food for P.D., and the mother was insensitive to P.D.'s crying.

P.D.'s visits with her mother were regularly scheduled to begin at 10:30 a.m. C.D.C. remained in her nightgown on one visit, did not answer the door on another visit because everyone was asleep, and was asleep when P.D. arrived for other visits. On one occasion, at 12:30 p.m., a worker found that P.D., who was 28 months old at the time, had been on her own while C.D.C. slept. C.D.C. ended visits early without giving a reason.

One DSS employee testified that while she supervised P.D.'s

visits with her mother, she observed very little contact between mother and daughter. P.D. was not given lunch until late in the afternoon and had no nap. The baby had only iced tea to drink, even in her bottle. Another DSS employee, who had supervised most of C.D.C.'s visits with P.D. beginning in November of 1985, testified that C.D.C. failed to give P.D. required medication; that there was little contact between the mother and daughter; and that although C.D.C. fed nutritious solids to P.D., pop and Kool-Aid were the only beverages she saw offered. Snacks for the child consisted of only candy.

The family support provider who supervised the visits reported that J.S. was verbally abusive to her and to P.D. on several occasions. P.D.'s foster mother complained that P.D. returned from visits dirty and with small red bumps (like chigger bites) on her arms, legs, and stomach. This information was received by way of a report. However, the foster mother was sworn as a witness and thus was available for cross-examination concerning her observations. See *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). On appeal, C.D.C. did not assign error to the reception of this evidence.

C.D.C. and J.S. were advised that they needed to review the case plan with DSS prior to the review hearing. They missed three appointments but kept the fourth. At that appointment, C.D.C. and J.S. were defensive. J.S., although living in the home, refused to complete a parenting course or to follow a case plan. They both insisted they could support P.D., even though neither had a job. C.D.C., who had by this time completed the court-ordered parenting class, agreed to the proposed case plan.

P.D. battled ear infections during the course of one summer and was ill at various times. C.D.C. insisted that she could care for the child, and the visits continued in spite of P.D.'s illness. Prescribed medication was placed in two bottles, one for the foster mother and one for C.D.C. C.D.C. consistently failed to give P.D. the medication. On one occasion, P.D. vomited when she arrived for her visit. The child was cared for by the family support provider and J.S.' mother because C.D.C. was still in bed. C.D.C. had been advised that the child was ill and would

need medication for her fever. The DSS worker observed C.D.C. ask J.S.' mother to go to the store for pop and cigarettes, but she made no mention of medication for the child. When P.D. was returned from the visit, she had not been medicated and was still suffering from her fever.

Finally, the State presented the testimony of Heidi Parker. Parker is the family support provider who supervised most of C.D.C.'s visits with P.D., beginning in November of 1985. Parker was present at the visits where C.D.C. failed to medicate P.D. She also was the worker who observed J.S.' verbal abuse. Parker testified that she saw little contact between C.D.C. and P.D. and that C.D.C. at times used inappropriate discipline measures. Parker had seen C.D.C. feed P.D. soup, spaghetti, goulash, and other nutritious foods for lunch. However, pop and Kool-Aid were the only beverages she saw offered. Parker had heard P.D. ask for juice, only to be told there was none. Later that day C.D.C. went to the store to purchase cigarettes, but did not get juice for P.D.

Only one witness testified on C.D.C.'s behalf. Vicky Todd testified that she was C.D.C.'s sister and had been at C.D.C.'s home when P.D. visited. Todd stated that the relationship between C.D.C. and P.D. was positive and that their interaction was good. She had observed C.D.C. and P.D. play peekaboo and patty-cake and had seen C.D.C. tickle and giggle with P.D.

On May 2, 1988, the Adams County Court, acting as a juvenile court, issued its order terminating C.D.C.'s parental rights in P.D. The court found that C.D.C. had "failed to demonstrate a positive caring attempt, as compared to any reasonable standard, to comply with the case plan and to regain physical custody of her daughter. She [C.D.C.], as shown by the evidence, still lacks necessary parenting skills and continues to neglect her child's needs."

C.D.C. claims the trial court erred: (1) in receiving into evidence the home study report from Alabama, (2) in receiving into evidence a written therapist's report, (3) in considering evidence of noncompliance with a case plan not under the court's direction, (4) in finding that the State met its burden of proof by clear and convincing evidence, and (5) in finding that termination of C.D.C.'s parental rights was in the best interests

of the child.

We begin our consideration of the first two assigned errors by remembering that the Nebraska Evidence Rules, Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1985), do not apply in juvenile court dispositional hearings such as one to terminate parental rights. The requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988); *In re Interest of J.S., A.C., and C.S., supra.*

C.D.C. first argues that the home study report conducted by the Alabama department of social services was inadmissible hearsay. She points to *In re Interest of J.S., A.C., and C.S., supra*, in which we found a DSS report to be inadmissible hearsay because the authors of the report were not available for cross-examination. We stated, "In proceedings to terminate parental rights under the Nebraska Juvenile Code, a parent has the due process right to cross-examine an adverse witness. . . . Without the test of cross-examination, the hearsay report was unreliable evidence for termination of parental rights." (Citations omitted.) *Id.* at 265-66, 417 N.W.2d at 157.

The Alabama report at issue was offered to prove the matter asserted therein and, therefore, constituted hearsay evidence. See Neb. Evid. R. 801 (definition of hearsay) (§ 27-801). The author of the report was not in court to be cross-examined by C.D.C. The report was not admissible, and the court erred in receiving it into evidence.

Next, C.D.C. argues that a written report by a family therapist should not have been received by the trial court because the therapist was not qualified to give the opinion contained in the report. The county judge ruled there was insufficient foundation for the therapist to orally testify as an expert. Rather than lay additional foundation, the county attorney questioned the therapist only as to her observations. The therapist's opinion contained in her written report should not have been received in evidence without further foundation.

The trial court's consideration of improper evidence does not, by itself, require reversal of a judgment terminating

parental rights under the Nebraska Juvenile Code. Because factual questions concerning a judgment or order terminating parental rights are tried by the Supreme Court de novo on the record, impermissible or improper evidence is not considered by the Supreme Court. *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988); *In re Interest of A.Z., B.Z., and R.Z.*, 230 Neb. 291, 430 N.W.2d 901 (1988).

Because the Alabama report and the therapist's opinion were inadmissible, they have not been considered in deciding this appeal.

C.D.C.'s third assigned error is that the trial court erred in considering noncompliance with a rehabilitation plan not under the court's direction. In her brief, C.D.C. presents the novel argument that, since the trial court did not order a plan until December of 1986, it should not consider evidence of events happening prior to that time. C.D.C. points to the following language from *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 110, 368 N.W.2d 474, 480 (1985), in support of her contention:

> While there is no requirement that a juvenile court must institute a plan for rehabilitation of a parent, where the failure of a parent to comply with a rehabilitation plan is an independent ground for termination of parental rights, the rehabilitation plan must be reasonable and conducted under the direction of the juvenile court.

From this language, it does not follow that, once a court orders a rehabilitation plan, it is prohibited from considering prior events when deciding whether to terminate parental rights. As the quote indicates, it is often necessary for a court to determine the reasonableness of a plan or its individual provisions. It is impossible to determine whether a plan to reunite a parent and child is reasonable without considering whether the plan is designed to correct problems which required the State's intervention in the first place. Review of prior events is essential to this determination. See, *In re Interest of L.J., J.J., and J.N.J., supra*; *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

In our de novo review, we do not consider as a basis for any termination order whether C.D.C. violated the terms of the

voluntary rehabilitation plan agreed upon by C.D.C. and DSS. It was not court approved or ordered. Further, we find no basis in the record to support a claim that the trial court based its termination order upon any alleged violation of the voluntary agreement. C.D.C.'s third assignment of error is meritless.

C.D.C.'s fourth assignment of error claims the trial court erred in finding that the State proved its case by clear and convincing evidence. A parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation designed to reunite the parent and child presents an independent reason justifying termination of parental rights under Neb. Rev. Stat. § 43-292(6) (Reissue 1988). The State must prove this failure by clear and convincing evidence. See, *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988); *In re Interest of L.O. and B.O.*, 229 Neb. 889, 429 N.W.2d 388 (1988).

All three of the court-ordered plans C.D.C. was to comply with required that she obtain employment, maintain a residence, visit with P.D. regularly, and cooperate with the family support provider. She was, at some time, also expected to attend a parenting class and family therapy, submit a budget to DSS, pay child support, and obtain a drug and alcohol evaluation and follow the counselor's recommendations. In the first plan, C.D.C. was given the option of attending school rather than obtaining employment.

C.D.C. never made a serious effort to become employed. Other than the few weeks she was recovering from surgery, C.D.C. had no excuse for not working. Registering for school and attending two classes cannot be considered compliance with that particular plan's provision. C.D.C. made no effort to maintain her own permanent home. The record shows a very clear pattern of moving from friend to friend and taking advantage of their hospitality. C.D.C. did not submit a budget to DSS. She never paid child support. She did not go to the scheduled family therapy sessions. She eventually submitted to a drug and alcohol evaluation, but did not follow the counselor's recommendations. C.D.C. did visit with P.D. regularly, but only so long as someone else made the effort to bring the child to her. The evidence shows that even then

C.D.C. was neither ready nor eager to see her child. C.D.C.'s care of P.D. during visitations shows a pattern of a lack of concern for the child's welfare. The only plan provisions with which C.D.C. successfully complied were completion of the parenting class and cooperation with the family support provider.

The evidence is clear and convincing that C.D.C. failed to fully comply with any of the court-ordered rehabilitation plans. The trial court was correct in so finding.

Finally, C.D.C. assigns as error the trial court's finding that termination of her parental rights was in the best interests of the child. Where parents are unable or unwilling to rehabilitate themselves within a reasonable time, the best interests of the child require that parental rights be terminated. *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988); *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988).

The evidence in this case underscores three glaring concerns with C.D.C.'s ability to parent P.D.: (1) use of drugs, (2) failure to provide a stable home, and (3) lack of interest and concern for the welfare of P.D. The rehabilitation plans reflect the court's and DSS' attempts to eliminate, or at least reduce, these problems. After missing several scheduled appointments and after being twice ordered by the court, C.D.C. did complete the drug and alcohol evaluation, but refused to follow the recommendations for ending her dependence. C.D.C. made no effort to provide a suitable, stable, permanent home for P.D. Between September 1985 and the trial in the spring of 1988, a period of 2½ years, C.D.C. had 14 separate addresses. The only reasonable conclusion is that C.D.C. is unwilling to alter these two deficiencies.

It may be argued that C.D.C. has shown interested concern for P.D. by keeping scheduled visits. Close examination of the facts indicates otherwise. C.D.C. was usually still in bed when P.D. arrived for visits, and on at least one occasion the child was left alone while her mother slept. When P.D. was originally removed, it was several weeks before C.D.C. was interested in seeing the child. The same is true of the time C.D.C. returned from Alabama. She also missed scheduled visits. Obviously, C.D.C. prefers to let others care for P.D. or to leave the child

alone, when caring for P.D. is inconvenient.

C.D.C. did not meet the basic needs of a small child. Lunch, though usually nutritious, was served late in the afternoon, sometimes by someone other than C.D.C. There was no milk or juice. P.D. always drank Kool-Aid or pop, and, as a baby, her bottle was filled with iced tea. C.D.C. purchased cigarettes for herself, but not juice or needed medication for her child, even when asked. Also troubling is C.D.C.'s failure to medicate P.D. when the child was ill. Finally, C.D.C. was not willing to spend time with P.D. if she had to provide transportation. C.D.C. likes having P.D. around, but only when it is convenient and requires little effort.

P.D. needs a stable home where her basic needs are consistently met. The evidence shows, clearly and convincingly, that C.D.C. has willfully neglected P.D. and that C.D.C. has willfully failed and neglected to provide P.D. a stable home where the child's basic needs are consistently met.

We find that all three court-ordered rehabilitation plans were designed to reunite C.D.C. with her daughter, and the plans' provisions are in all respects reasonable. C.D.C.'s indifference toward her child, C.D.C.'s lack of interest in being a mother concerned with P.D.'s welfare, and C.D.C.'s pattern of self-indulgence, all as reflected in the record, militate against any reasonable chance of reunification of mother and child. The only alternative to termination of C.D.C.'s parental rights is continued efforts to rehabilitate by the DSS, while P.D. remains in foster homes. A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of A.G.G., supra.*

P.D. was 4 months old when she was removed from her mother. On May 10, 1989, P.D. would be 4 years old and still in a foster home. P.D.'s best interests require termination of her mother's parental rights.

The order of the trial court terminating C.D.C.'s parental rights in P.D. is correct and is affirmed.

AFFIRMED.