IN RE INTEREST OF T.E., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. Z.R., APPELLANT.
458 N.W.2d 753

Filed August 3, 1990.   No. 90-055.

Joseph Lopez Wilson for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The father, Z.R., appeals from the order of the separate juvenile court terminating his parental rights to his minor son, T.E.

T.E. was born out of wedlock on February 17, 1984. The birth certificate issued at that time did not list the name of the father. The child was removed from the custody of his mother in August 1986. In August 1989, the parental rights of T.E.'s natural mother were terminated. See *In re Interest of T.E.,*

*S.E., and R.E.*, 235 Neb. 420, 455 N.W.2d 562 (1990). On August 18, 1989, a petition was filed alleging that T.E. came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988), insofar as the father is concerned, and had been abandoned by the father within the meaning of Neb. Rev. Stat. § 43-292(1) (Reissue 1988).

An adjudication hearing was held on December 5, 1989. At the beginning of the hearing, the State introduced into evidence a birth certificate, amended on February 17, 1987, to name appellant as T.E.'s father, and appellant's attorney and T.E.'s guardian ad litem stipulated that appellant is T.E.'s father.

Judy Olmer, the Child Protective Services worker to whom T.E.'s file had been assigned in March 1988, had her first contact with appellant in February 1989. Appellant wanted custody of T.E. if T.E.'s mother lost custody, and Olmer suggested appellant contact the court administrator, retain an attorney, and be represented in juvenile court. As a result of this conversation, Olmer reviewed T.E.'s file and found that appellant's name was on the amended birth certificate and that appellant had had two visits with T.E. in 1987. To Olmer's knowledge, appellant had made no contacts with her agency, was not on the visitation schedule, and had not yet claimed paternity.

Apparently, sometime before appellant's February 1989 phone call, Olmer had talked to appellant's mother on several occasions and found out that she, the mother, had been in touch with appellant. Olmer told appellant's mother that she needed to have appellant contact the court administrator and that if appellant could not afford an attorney, an attorney would be appointed for him.

There was no contact made by appellant with Olmer from February through August 17, 1989. To her knowledge, appellant had not visited the child during that period of time nor had he contacted anyone else in Olmer's office. Although Olmer gave appellant the address and phone number of her office and encouraged him to send money, gifts, letters, or cards to the child through that address, nothing was ever received.

Olmer also testified that appellant knew the location of the foster home where the child was residing, but, according to the

foster mother, appellant had never visited the child.

Kara Murphy, who had been a probation officer for the juvenile court for 14 months prior to the adjudication hearing, testified that the child had been on her caseload since September 1988. She testified that during that period of time she had received no phone calls, correspondence, or other contact from appellant requesting to become involved in the juvenile proceedings or inquiring about the welfare of the child.

Appellant's mother testified that she talked to Olmer three or four times between February and August 1989 and would request that appellant be allowed visitation with the child. She also testified that she knew who the child's foster family was, as well as their address and phone number. According to her, appellant had made "numerous phone calls" to the child. She knew about one call because appellant called her to get the child's phone number, then called her back to tell her that he had talked to the child.

Appellant testified that he is presently in the U.S. Navy and has been for 2 years. He claimed to have lived with the child, but not since February 1986. He made a vague reference to having visited the child numerous times at the child's maternal grandmother's house, but no dates were given. He insisted that he had hired a lawyer to become involved in the original juvenile court proceedings, but admitted that he never did enter into the court proceedings. He also said that he called the child "several" times between February and August 1989. He admitted that he had never sent any money for the support of his child, but alleged that he had attempted to have the child claimed as a dependent on the Navy's records. His excuse for the fact that no Navy allotment was ever forthcoming was that he did not know the child's address.

In an order filed December 12, 1989, the juvenile court found the child to have been abandoned by the appellant, found that it was in the best interests of the child that parental rights be terminated, and terminated appellant's parental rights to the child.

An order terminating parental rights must be based on clear and convincing evidence. Clear and convincing means and is that amount of evidence which produces in the trier of fact a

firm belief or conviction about the existence of a fact to be proved. *In re Interest of J.B. and A.P.*, 235 Neb. 74, 453 N.W.2d 477 (1990).

Section 43-292(1) provides that the court may terminate all parental rights between a parent and child when the parent has abandoned the child for 6 months or more immediately prior to the filing of the petition. "Abandonment," for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for displaying parental affection for the child. *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990); *In re Interest of J.M.D.*, 233 Neb. 540, 446 N.W.2d 233 (1989); *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988). The question of abandonment is largely one of intent, to be determined in each case from all of the facts and circumstances. *In re Interest of A.G.G., supra.*

The evidence is clear and convincing that this child was abandoned by appellant.

Neb. Rev. Stat. § 43-1402 (Reissue 1988) provides that "[t]he father of a child [born out of wedlock] whose paternity is established . . . by acknowledgment . . . shall be liable for its support to the same extent and in the same manner as the father of a child born in lawful wedlock is liable for its support." Appellant acknowledged his paternity of the child by his conduct, including his testimony in court. Therefore, he was legally liable for the child's support. Nevertheless, during the 6 months immediately prior to the filing of the termination petition, appellant provided no financial support for his son. In fact, appellant has never provided financial support for T.E. Appellant had an obligation to provide financial support and failed to fulfill his obligation.

Appellant's story that he attempted to claim his son as a dependent when he joined the Navy so as to provide for his care, but could not do so because he did not have the child's address, defies belief. In his enthusiasm to demonstrate that he called his son on "numerous" occasions, he disclosed that he knew of the child's location. Appellant knew how to contact Child Protective Services and the juvenile court, and was urged

by a worker of the former agency to call, write, and send gifts to the child. Appellant knew that his own mother was aware of the location of the child, yet he never sent money to her to be forwarded to his child.

In the 6 months immediately prior to the filing of the petition, appellant made no inquiries of anyone at Child Protective Services as to the well-being of his son. Given his call to Olmer in February 1989, it is clear appellant knew that he could make inquiries if he wanted to. Even if appellant was unable to make phone calls because he was at sea for 3 of the 6 months, he failed to do anything when he was not at sea. Furthermore, the record is devoid of any evidence of attempts by appellant through the various resources offered by the Navy to contact or provide for his son.

Olmer testified that appellant did not phone his son until after the termination petition was filed. Appellant, on the other hand, testified that he phoned T.E. "a lot." According to appellant, he first called his son 5 months prior to the termination hearing (in July 1989) and called him about nine times. It is clear from appellant's testimony that some, if not most, of the phone calls took place after the termination petition was filed.

Assuming, without deciding, that appellant did call T.E. prior to the filing of the termination petition, appellant still abandoned his son within the meaning of § 43-292(1). Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child. *In re Interest of J.M.D., supra.* Considering his failure to provide any kind of financial support for the child, his failure to contact the welfare agency regarding his son's welfare from at least March 1988 to February 1989, and his failure to utilize the address given in order to maintain contact with his son, appellant's eleventh-hour phone calls may be characterized as nothing more than token efforts to maintain a minimal contact with T.E.

The evidence is also clear and convincing that termination of appellant's parental rights would be in T.E.'s best interests. As this court has said many times before, a child cannot, and should not, be suspended in foster care, nor be made to await

uncertain parental maturity. *In re Interest of L.K.Y. and A.L.Y.*, 235 Neb. 545, 455 N.W.2d 828 (1990).

The order of the juvenile court is affirmed.

AFFIRMED.