IN RE INTEREST OF E.G., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. B.B., APPELLANT.
482 N.W.2d 17

Filed March 27, 1992. No. S-91-715.

Leonard G. Tabor for appellant.

Sara Olsen, Deputy Scotts Bluff County Attorney, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Sitting as a juvenile court, the tribunal below found that the 23-year-old appellant mother had abandoned her then 3-year-old son, as had the child's purported legal father. Based on that finding, the juvenile court terminated the mother's and purported legal father's parental rights in and to the child. Only the mother has appealed, asserting that the juvenile court erred in (1) granting the appellee State leave to amend the pleading on which the juvenile court based its judgment, (2) finding the evidence sufficient to support the claimed abandonment, and (3) finding that termination of her rights is in the child's best interests. We affirm.

We begin by noting that the paternity of the child is less than clear. The mother claims that one L.S. is the child's biological father. On the other hand, the State, through a caseworker employed by its Department of Social Services, asserts that one K.G., the individual named in this action, is the legal father, as he "signed paternity on" the child. It appears K.G. did so because he was living with the mother at the time of the child's birth and the couple was planning to marry. However, no marriage took place, and K.G. has since relinquished to the State all rights he may have in and to the child. Inasmuch as only the mother has appealed and the alleged biological father was not made a party to these proceedings, we do not concern ourselves with the rights of anyone who may be any type of father to the child.

From the time of the child's birth on April 7, 1988, until May 31, 1990, the mother lived and worked in Alliance, Nebraska. She and a girl friend then went to Greeley, Colorado, to visit the girl friend's boyfriend. The mother took the child with her. For the next month the mother stayed at the boyfriend's house or in motels. On June 23, 1990, she took a job with a carnival, which traveled to various states in the region. She continued with this employment until November 4, 1990. On occasion, she would take the child with her; at other times, she left the child with the girl friend. When she was away, the mother gave the girl friend money for the child's food and clothing. The mother's then paramour, not the purported legal father of the child, would also help in supporting the child.

In August 1990, the carnival was in Rapid City, South Dakota. For whatever reason, the girl friend was with the mother and the child. The mother let the girl friend use her automobile. The girl friend, without permission, took the child and returned to Greeley. Although not expressly stated, the relationship between the girl friend and the mother appears to have been strained at this point; the mother testified that the girl friend frequently lied to her and was later imprisoned for selling marijuana. The mother has not seen or talked to the girl friend since the events in August.

Upon returning to Greeley, the girl friend telephoned the child's maternal grandmother in Gering, Nebraska, and told

her to come to Greeley and pick up the child, apparently because the mother was failing to take care of him. The grandmother returned to Nebraska with the child on August 22, 1990, and asked the aforementioned caseworker to place the child in foster care, stating that she could not take care of him.

The child seems to have been placed in the custody of the State on or about August 31, 1990. Physical possession of the child was initially placed with the grandmother. However, on September 10, 1990, his physical possession was placed with the mother's stepbrother and his wife. On May 10, 1991, physical possession of the child was placed in a foster home, where it has remained.

At some point which is not clear, the grandmother told the mother that the child had been placed in foster care. The mother had no communication or physical contact with the child from approximately August 18, 1990, until July 11, 1991, the day of the hearing resulting in the termination of her parental rights in and to the child.

Between October 5, 1990, and June 5, 1991, the caseworker engaged in six telephone conversations with the mother. It appears therefrom that the mother had been traveling with the carnival until May 1991, when she returned to Colorado, and that the mother knew of the child's placement in foster care sometime before the first conversation. She also knew of two scheduled court hearings, neither of which she attended. She said she could not be at the first because of her carnival commitments and had been unable to attend the other because of lack of finances. On one occasion, the mother told the caseworker she wanted her child, but planned to live in Arizona. The caseworker explained the mother's rights under the interstate compact system, but there is no indication the mother ever contacted the Arizona authorities.

According to the caseworker, she initiated conversations with the mother regarding the child's welfare. The mother did not send money or clothes for the child, nor did she send him gifts or cards.

The caseworker further testified that when the child was taken into custody,

> [h]e was very small, his gross motor coordination was

fairly slow, his fine motor coordination was fairly slow. He had a hard time playing with fine toys that took a lot of fine motor skills, of fine hand movements. And his speech was very far behind. I believe, on the growth charts he was under 25 percent, the 25 percentile on growth and height.

According to the caseworker, by the time of the subject hearing, the child was "doing great. . . . wonderfully"; his chipped front teeth had been repaired, and he enjoyed a good relationship with his foster parents, who would like to adopt him.

The mother testified that lack of financial means was the primary reason she did not retrieve the child. While she continued to work in the carnival after the child was taken to Nebraska in August, she was unable to collect enough money to return. Both the mother and her paramour testified that after the carnival job ended on November 4, they intended to return to Nebraska, but their vehicle broke down on the border of Texas. Because it was not easily repairable, they sold the vehicle for $20 and caught a ride with some friends back to Arizona, as they "had no choice but to go to Arizona." Once in Arizona, neither worked until mid-January, when they rejoined the carnival in an unsuccessful effort "to try and raise the money to get up here to Nebraska and settle down."

The mother testified that she had contacted her father about living at his home in Nebraska until she and her paramour could get on their feet, but the father declined.

After learning about the scheduled termination hearing, the mother and paramour borrowed an automobile to attend court. The mother stated she felt her

son was kidnapped and because of the circumstances that [the paramour] and I were in, we could not get back up here to Nebraska. And I feel that it's not a choice of somebody else to make the decision where my son should be. And because I love my son and I know I haven't been up here, we have not had sufficient funds to get back up here and it has been really hard getting up here. But now we are here and we are trying to get this worked out.

When working with the carnival, the mother earned between $50 to $100 a week and was responsible for paying all motel and eating expenses. The paramour made approximately $100 to

$200 a week. When asked why they remained with the carnival if they were not making enough money to return to Nebraska, the mother responded: "Because we . . . both looked for jobs in Arizona and nothing came through. And we knew that the carnival, there was money there, and we were hoping to be out for a couple weeks, get up enough money to get up here and get settled." However, further testimony revealed that when the mother and her paramour returned to the carnival on January 18, 1991, they had to borrow money from their boss, since it was a cold winter and business was slow. In May 1991, the mother and her paramour moved to Greeley by pawning her diamond engagement ring and two wedding rings, which they had purchased in South Dakota approximately a year before the hearing.

In the first assignment of error, the mother claims the juvenile court erred in allowing the State to amend its motion to terminate parental rights. The motion, as filed on March 25, 1991, read: "In support of this Motion, the State alleges that [the mother] and [the purported legal father] have each abandoned the [child] for six months or more *proceeding* the filing of a Petition in this case on August 31, 1990 alleging parental neglect and abandonment." (Emphasis supplied.)

The August 31 date apparently refers to the date on which the State signed the initial petition, on the basis of which the juvenile court asserted jurisdiction. This petition was not filed, however, until September 5, 1990. In any event, the confusion began when, after the State rested, the mother moved to dismiss the action "for a complete lack, failure by the State to show abandonment prior to August 31st, 1990." The mother then went on to say, "[T]he motion says abandonment for six months or more *preceding* the following [sic] petition, on August 31, 1990. So, actually what's happened since then, to my way of thinking, is irrelevant under the law." (Emphasis supplied.) Based on her mistaken substitution of the word "preceding" for "proceeding," the mother obviously concluded that since in the 6 months prior to August 31, 1990, the child had not been abandoned, the State had failed to prove its case.

Seemingly without verifying the language it had written, the

State moved for leave to amend its motion so as to conform with the evidence, as all parties appeared to know that the period at issue was from August 1990 to March 1991. The juvenile court, to all appearances also without reading the motion, accepted the mother's reading and permitted the State to amend by striking from the motion the word "Petition" and substituting in its place the phrase "Motion to Terminate Parental Rights." Thus, it appears the mother, the State, and the judge all assumed the original petition read "preceding" instead of the actual language, "proceeding." The motion as amended now reads: "In support of this Motion, the State alleges that [the mother] and [the purported legal father] have each abandoned the [child] for six months or more *proceeding* the filing of a Motion to Terminate Parental Rights in this case on March 25, 1991 alleging parental neglect and abandonment." (Emphasis supplied.)

However, although not phrased in the usual or best language, the motion as it originally read nonetheless correctly expressed the State's intended allegation. "Proceed" means, among other things, to move forward. 12 The Oxford English Dictionary 544 (2d ed. 1989). "Proceeding" is the action verb of proceed and means going onward. *Id.* at 545. See, also, Webster's Third New International Dictionary, Unabridged 1807 (1981). Thus, as originally written, the motion included the period between September 5, 1990, when the initial petition was filed, and March 25, 1991, when the motion at issue was filed.

As a result of the reliance on the mother's misreading of the motion, the State sought, and the juvenile court allowed, an inappropriate change which, but for the consideration written about later, would require the State to show abandonment for 6 months following the filing of the motion—an impossibility, since the hearing was held but 3¹/₂ months after the motion was filed.

Although the motion now reads incorrectly, the record nevertheless demonstrates that the mother knew it was the events occurring after September 5, 1990, which were at issue, and by her conduct waived any objection she may have had to the receipt of evidence relating to that time period, for she presented extensive evidence of post-September 5, 1990, and

pre-March 25, 1991, events.

> "If when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, or fails to object, or to insist upon a ruling on an objection to the introduction of such evidence, and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, and the evidence is in the record for consideration the same as other evidence."

*In re Estate of Kaiser*, 150 Neb. 295, 308, 34 N.W.2d 366, 374-75 (1948). See, also, *Griffith v. Griffith*, 230 Neb. 314, 431 N.W.2d 609 (1988); *In re Estate of Hill*, 214 Neb. 702, 705, 335 N.W.2d 750, 752 (1983) ("[a] party may, by his acts or omissions, waive, or be estopped to make, objections to the admission or exclusion of evidence [by a] failure to object"). Thus, if the mother truly thought the motion sought to prove abandonment for the 6 months preceding September 5, 1990, she should have objected when post-September events were raised in the testimony, and under no circumstance should she have contributed to such testimony.

Under these circumstances, the hearing resulting in the judgment at issue was controlled by the motion as originally written, and there is thus no merit to the mother's first assignment of error.

The mother next complains that the evidence does not clearly and convincingly establish that she abandoned the child during the 6 months following the filing of the petition in September 1990.

Neb. Rev. Stat. § 43-292(1) (Reissue 1988) provides that parental rights may be terminated when a child has been abandoned "for six months or more immediately prior to the filing of the petition," in this case the motion of March 25, 1991.

The abandonment contemplated in the foregoing statute exists when, for a minimum of 6 months before the operative pleading is filed, the parent intentionally withheld " 'from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for displaying parental affection for the child.' " *In re Interest of K.M.S.*, 236

Neb. 665, 670, 463 N.W.2d 586, 590 (1990). According to the testimony in *K.M.S.*, the father asserted that he wanted to create a relationship with his offspring, but had made no effort to see, support, or care for the juvenile. In affirming the termination of the father's rights, we observed that fulfillment of a parent's obligation requires a continuing interest in and a genuine effort to maintain communication and association with the child. As noted in *In re Interest of T.E.*, 236 Neb. 53, 57, 458 N.W.2d 753, 756 (1990), "[a]bandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child."

In *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990), the father had been in and out of prison over a 14-year period and had made no attempt when he was not incarcerated to pay child support or learn the whereabouts of his son, being "spurred to action only after receiving notice that his parental rights were to be terminated." 235 Neb. at 736, 457 N.W.2d at 297. In affirming the termination of the father's rights, we declared:

> To prove abandonment, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. Mere inadequacy is not the test.

235 Neb. at 735, 457 N.W.2d at 296.

Having considered the evidence de novo, as we are required to do, *In re Interest of L.P. and R.P.*, ante p. 112, 480 N.W.2d 421 (1992), we conclude, independent of the finding of the juvenile court, that the evidence outlined earlier clearly and convincingly establishes that the mother abandoned the child for at least 6 months prior to the filing of the March 25, 1991, motion. Her appearance at the last hearing was but a token gesture which could not undo the past repudiation of her parental responsibilities; she was less than inadequate in that she completely surrendered her responsibilities toward the child and conducted herself in a manner which evidenced a settled

purpose to be rid of all her parental obligations and to forgo all parental rights.

Contrary to the mother's assertion in her third and last assignment of error, there is no question that terminating her parental rights serves the child's best interests. He has been in a state of limbo for half of his 4 years of life; he had no stability while he was with his mother, and even after his grandmother retrieved him, he was, until placed in his present foster home, shunted from place to place. Perhaps the most significant piece of evidence bearing on this issue is that away from his mother, the child's arrested state of development is being reversed.

AFFIRMED.