457 N.W.2d 274 (1990)
235 Neb. 703
In re Interest of L.C., J.C., and E.C., Children Under 18 Years of Age.
STATE of Nebraska, Appellee
v.
L.T.C. and K.K.C., Appellants.
No. 89-829.
Supreme Court of Nebraska.
July 6, 1990.
*275 Roberta S. Stick, of Legal Services of Southeast Nebraska, Lincoln, for appellants.
Richard E. Rothrock, Deputy Lancaster County Atty., for appellee.
HASTINGS, C.J., and BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
CAPORALE, Justice.

I. INTRODUCTION
Defendant father, L.T.C., and defendant mother, K.K.C., appeal from the termination of their parental rights to L.C. and J.C., twin sons born to them on June 15, 1974, and to E.C., a son born to them on November 6, 1975. They contend that the court below erred (1) in failing to find that the State Department of Social Services had breached its responsibility to use reasonable efforts to reunify the family, (2) in finding that they had continuously or repeatedly neglected their children and refused to give them the necessary parental care and protection, and (3) in terminating their parental rights. We affirm.

II. FACTS
The juvenile division of the Seward County Court acquired jurisdiction over the children on June 26, 1978, as the result of an *276 adjudication that they fit within Neb.Rev.Stat. § 43-202(2)(b), (c), (d), and (e) (Reissue 1978), precursor to Neb.Rev.Stat. § 43-247(3)(a) (Reissue 1988), because of the unclean condition of the family's residence, the lack of food available at the residence for the children to eat, and the unsuitable and unclean mattress on which the children slept, and because the children were "quite dirty," wore unclean clothes, were "underfed," and "appeared ... to have potential nutritional deficiencies" and "to suffer from arrested social and mental development."
Following a dispositional hearing on January 3, 1979, temporary custody of the children, who had been removed from the natural parents' home, was placed with the Seward County department of public welfare, which placed them in a foster home. The county court ordered that "continuing efforts be made to provide the natural parents with the necessary skills and training to enable them to re-unite the family." At a successive review hearing, the court, determining that the parents' cooperation with assisting social services agencies was poor, "with occasional progress ... followed by retrogression," ordered "total cooperation by [the] parents with assisting agencies" and further ordered that visitation between the parents and children continue.
After a subsequent review hearing on March 31, 1980, the Seward County Court determined that "after a period of two years of intensive assistance" and "all reasonable efforts having been made to reunite [the] family," the parents remained unable to adequately care for their children, and accordingly placed permanent custody of the children with the state Department of Public Welfare, now the Department of Social Services (department), "for permanent foster placement" and ordered that "no further visitation or association [with the parents] be allowed." On appeal by the parents from this order, the district court for Seward County, on January 16, 1981, concluded that the county court's order of March 31, 1980, had in effect terminated the parents' rights in and to their children without any pleading having been filed which sought such action. The district court therefore vacated the county court's order and remanded the matter for further proceedings.
On May 3, 1982, the county court, at the parents' request and under the authority of Neb.Rev.Stat. § 43-202.04 (Reissue 1978), now Neb.Rev.Stat. § 43-282 (Reissue 1988), transferred jurisdiction of the matter to the separate juvenile court of Lancaster County, the then residence of the natural parents and arguable domicile of the children. The separate juvenile court continued the existing custody arrangements for the children but did not order visitation or institute a plan with which the parents were required to comply. Such situation continued until October 10, 1983, when the separate juvenile court ordered that the parents be granted visitation with the children at least once per month but prohibited them from discussing with the children any attempt to regain custody.
On April 20, 1984, the separate juvenile court ordered continued visitations between the children and their parents, supervised by Parents and Children Together (PACT), a program designed to facilitate the reuniting of the family by teaching parenting skills to parents during their interaction with their children; extended or overnight visits in the parents' residence "conditioned upon an adequate physical environment"; a psychological evaluation of each parent; counseling for the parents, foster parents, and children; and that all interested parties consider long-term care that provides permanence for the children. On October 22, 1984, the separate juvenile court increased visitation to once every 2 weeks "because the [department] has only arranged limited visitation."
Subsequently, on May 24, 1985, the separate juvenile court determined that the visitations were emotionally disturbing to the children and that the children did not want visitations with their parents, and, based upon the opinion of a clinical psychologist that the visitation previously ordered by the court was not in the children's best interests, decreased visitation to once every 2 months. Such situation continued *277 until November 25, 1986, when the court ordered the maximum visitation consistent with the welfare and best interests of the children. This situation prevailed until January 17, 1989, when the court ordered the parents to cooperate with the social workers involved in their case and for the first time specifically directed them to "correct the conditions of neglect that led to their children being removed from their home."
A petition to terminate the parents' parental rights was filed on March 9, 1989. The separate juvenile court terminated the parents' rights on July 7, 1989, because they had substantially and continuously or repeatedly neglected the children and refused to give them necessary parental care and protection, the ground for termination contained in Neb.Rev.Stat. § 43-292(2) (Reissue 1988), and because termination was in the children's best interests. The court specifically found that the record did not support a finding that the parents had been provided sufficient direction as to the conditions they were required to correct in order that their children be returned to them and that, thus, no basis for termination of their parental rights existed under & sect; 43-292(6). That subsection empowers a court to terminate parental rights when "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination."
The social worker who worked with the parents from 1981 through 1984 testified that prior to the overturning of the county court's March 31, 1980, order, his efforts had been directed toward facilitating adoption of the children. He made no effort to establish visitation between the parents and children until sometime in 1984, when such was ordered by the separate juvenile court. The social worker who next worked with the parents also admitted that the department's goal during his tenure from August 1984 until June 1985 was not reunification of the family but was adoption of the children by the foster family and, therefore, that he did not undertake overt steps to rehabilitate the parents. According to the family case manager, the department continued to promote adoption until September 1985, when it realized that adoption of children whose parents' parental rights were still intact was an unrealistic goal and changed the goal to long-term foster care. The case manager testified that it was not until April 1988 that the department formally instituted rehabilitation of the family as its goal. A social worker who worked with the parents in 1988 viewed herself as working to rehabilitate them to the point that the children could make visits in the parents' residence. This worker related, however, that at the end of her tenure, the department was requesting termination of parental rights.
After the order removing the children from the parents' home in 1978, the county department of public welfare provided visitations at least every 2 weeks between the parents and the children. The visitations were generally supervised, lasted between 1 and 2 hours each, and took place in a public park or in a small conference room. In 1979, as a result of the family's involvement in PACT, the visitations were increased to several times per week, and several in-home visitations and at least one overnight visitation occurred.
Because of the county court's March 31, 1980, order terminating visitation between the natural parents and their children, the appeal of that order to the district court, and the subsequent transference of the case to the separate juvenile court, the children had no contact with their natural parents for a period of about 4 years from 1980 until sometime in 1984. During the remainder of 1984 through at least May 1985, visitation occurred about two or three times each month for 3 to 4 hours each, and there was at least one overnight visit. Thereafter, visitation between the parents and children has been periodic but infrequent, occurring five or six times in each of the years 1986, 1987, and 1988, with each visit lasting between 1 and 2½ hours.
A PACT director who worked with the parents in 1979 and again in 1983 was called as a witness by the parents and stated that when she began working with the parents, they were "very cooperative," responded "very positively" to suggestions, *278 and made an effort to keep their residence cleaner. When she again worked with the parents in 1983, their parenting skills were still "not highly developed." It is apparent from the record that by April 1988, the parents had become disenchanted with the system and were no longer willing to cooperate with the social workers unless "it was in writing that it was a possibility the children would be returned to them." As the mother stated, "[S]omething should have been done a long time ago, but now it [is] too late."
Several of the social workers who worked with the parents throughout this case provided testimony that they instructed or attempted to instruct the parents on proper nutrition for the children, housekeeping skills, budgeting, personal hygiene, and basic parenting skills, and that they notified the parents of the conditions they needed to correct in order for the children to be returned to them, including that they obtain employment, remain in one location, and establish a home, and, in the case of the father, that he quit drinking alcohol. One social worker admitted, however, that although he identified for the parents various services that were available to them and encouraged the mother to become involved in parenting and nutrition classes, he did not undertake overt steps to provide these services to the parents but instead left it to the parents to pursue these services.
Although there was evidence that the parents participated in PACT training classes, they were never, according to several social workers, able to improve their budgeting and housekeeping skills. According to one social worker, there were "never consistent gains made that would have resulted in an appropriate environment for the children. Gains were very short term, but then there would be a regression." The parents' residences were found in an unclean condition on many occasions. On more than one occasion since the children were removed, the parents had an inadequate amount of food in their residence. Although the father had an occasional odd job, neither of the parents was ever employed for significant periods of time. Their only income was through Social Security benefits. The father was seen drunk on the street by several people at various times, arrived in a drunken condition at one of the visitations with the children, and missed another visitation because he was drunk. There was also testimony that the parents moved frequently.
Each of the social workers questioned on the subject opined that the parents were never in a position to have the children returned to them. The reasons given were the inadequate living conditions of the parents' various residences, the limited intellectual functioning and physical capabilities of both parents, and the fact that the parents themselves were very dependent upon others to take care of them.
The children have lived with their current foster family since 1980. A clinical psychologist who interviewed the parents and children and observed them interact testified that the children have bonded to their foster parents, perceive the foster parents as their own, and look to them for parental guidance. This witness recommended that the children not be returned to the natural parents even if they were to become able to parent because such would cause the children psychological damage. He opined that termination of parental rights was in the children's best interests and expressed the further view that continued visitation with the natural parents would be psychologically and emotionally damaging to the children.
A counselor who had been working with the children for approximately 3 years also testified that the children have no emotional attachment to their natural parents and are instead emotionally attached to the foster family, that reuniting the children with their natural parents would be emotionally and psychologically damaging to the children, that being adopted by the foster parents would create for the children the sense of permanency and stability which they need, and that termination of parental rights is in the children's best interests.
*279 Even the PACT director mentioned earlier, who was called as a witness by the parents, testified that termination of visitation with the natural parents and adoption by the foster family were in the children's best interests. She stated that as early as 1983 and 1984, the children had formed a "pretty solid" emotional attachment to the foster family and were no longer able to attach to their natural parents. This witness agreed that removal of the children from the foster home and placement with the natural parents would be very disruptive of the children's lives. She stated that although after the children had been removed from the parents' home she was of the opinion that the children "appeared to care" for the parents and that the parents could take care of them with the assistance of community support services, she subsequently recommended an open adoption and at the termination hearing testified that even with intensive services, it was "too late" for the family to be reunited.
Each of the children testified that he had no feelings for his natural parents, referred to his foster parents as "mom and dad," and expressed a desire that visitations be discontinued and that he be adopted by the foster family. The foster mother testified that as dispositional review hearings approached, the children would become belligerent and withdrawn, isolating themselves from the rest of the family. According to both the counselor mentioned earlier and the PACT director, a "great deal of weight" should be given to the children's desires concerning visitation.
The foster family has expressed a willingness and desire to adopt the three children. The natural parents themselves have stated that they want the children to remain in foster care and do not feel they could care for the children, but that they want the visitations to continue.

III. ANALYSIS

1. Department's Duty
The parents' first contention is that under Neb.Rev.Stat. §§ 43-245 to 43-2,129 (Reissue 1988), parental rights may not be terminated until the department has expended reasonable efforts to reunify the family and that in this case the department breached its responsibility.
In so arguing, the parents refer us to several cases from other jurisdictions in which courts have, based upon the applicable agency's failure to make reasonable efforts to reunite the family, reversed lower court determinations to terminate parental rights. In each case the court determined that the agency had a statutory obligation to render such efforts prior to termination of parental rights under the theory of termination alleged. See, Matter of Leon RR, 48 N.Y.2d 117, 397 N.E.2d 374, 421 N.Y.S.2d 863 (1979) (New York statute, Social Services Law § 384-b, required that in order to terminate parental rights on the theory that child is permanently neglected, state must prove parents failed for period of more than 1 year after child placed within care of authorized agency to substantially and continuously or repeatedly maintain contact with or plan for future of child although physically and financially able to do so, notwithstanding agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to best interests of child); Matter of Jason S., 117 A.D.2d 605, 498 N.Y.S.2d 71 (1986); Matter of Sheila G., 61 N.Y.2d 368, 462 N.E.2d 1139, 474 N.Y.S.2d 421 (1984); In re Kristina L., 520 A.2d 574 (R.I.1987) (Rhode Island statute, R.I.Gen.Laws § 15-7-7 (1984), required that in order to terminate parental rights on basis that child has been in the care of a child placement agency for 6 months, state must prove that it made reasonable efforts to reunite the family); Matter of Jones, 436 N.E.2d 849 (Ind.App.1982) (at the time of the case, Indiana statute, Ind.Code § 31-6-5-4 (Supp.1981), required that in order to terminate parental rights, the state must prove the child has been removed from the parents for 6 months under a dispositional decree, there is a reasonable probability that the conditions which resulted in removal will not be remedied, termination is in the child's best interests, the county department has a satisfactory plan for the care and treatment of *280 the child, and reasonable services have been offered or provided to the parent to assist in fulfilling the parental obligation and parent has failed to accept them or they have been ineffective).
In an effort to relate the foregoing holdings to our law, the parents urge that not only does § 43-246 place upon the department the burden to make reasonable efforts to reunite the family prior to seeking termination of parental rights, but so does § 43-284.
Section 43-246 provides, in pertinent part, that the juvenile code shall be construed to effectuate the following:
(1) To assure the rights of all juveniles to care and protection and a stable living environment and to development of their capacities for a healthy personality, physical well-being, and useful citizenship and to protect the public interest;
(2) To provide for the intervention of the juvenile court in the interest of any juvenile who is within the provisions of the Nebraska Juvenile Code, with due regard to parental rights and capacities and the availability of nonjudicial resources;
....
(4) To achieve the foregoing purposes in the juvenile's own home whenever possible, separating the juvenile from his or her parent only when necessary for his or her welfare or in the interest of public safety and, when temporary separation is necessary, to consider the developmental needs of the individual juvenile in all placements and to assure every reasonable effort possible to reunite the juvenile and his or her family.
We have enunciated that the policy statements recited above "are laudable" and establish a generalized program for the juvenile courts and the department to follow. State v. Duran, 204 Neb. 546, 554, 283 N.W.2d 382, 387 (1979). Nevertheless, § 43-246 has never been interpreted to require that the department institute a plan for rehabilitation of a parent whose child has been found to be dependent and neglected. See, In re Interest of C.D.C., 235 Neb. 496, 455 N.W.2d 801 (1990); In re Interest of P.D., 231 Neb. 608, 437 N.W.2d 156 (1989). Indeed, we have held that the juvenile court may terminate parental rights under the various grounds specified in subsections (1) through (5) of § 43-292 without providing the parent with a reasonable opportunity to rehabilitate himself or herself. See, In re Interest of M.B., R.P., and J.P., 222 Neb. 757, 386 N.W.2d 877 (1986); In re Interest of M.W.M., 221 Neb. 829, 381 N.W.2d 134 (1986); In re Interest of W., 217 Neb. 325, 348 N.W.2d 861 (1984); In re Interest of Wood and Linden, 209 Neb. 18, 306 N.W.2d 151 (1981); In re Interest of Wagner and Russell, 209 Neb. 33, 305 N.W.2d 900 (1981); State v. Duran, supra. It is only to terminate parental rights pursuant to subsection (6) of & sect; 43-292 that the State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. See State v. Duran, supra.
Section 43-284 reads in relevant part:
The court may enter a dispositional order removing a juvenile from his or her home only upon a written determination that continuation in the home would be contrary to the welfare of such juvenile and that reasonable efforts have been made to prevent or eliminate the need for removal of the juvenile from his or her home and to make it possible for the juvenile to return.
It is apparent, however, that the foregoing language has application only to the dispositional order which initially removes the juvenile from the parental home and does not have application to the ultimate determination of whether to terminate parental rights. If reasonable efforts were not made in this case to prevent the need for removal of the children from the home or the court made no such finding, the parents had an opportunity to appeal from the dispositional order removing the children from the home. See, In re Interest of R.A. and V.A., 225 Neb. 157, 403 N.W.2d 357 (1987); In re Interest of V.T. and L.T., 220 Neb. 256, 369 N.W.2d 94 *281 (1985). Having failed to appeal that determination, they may not now complain of it.
Thus, irrespective of what the law of other jurisdictions may be, the parents' first assignment of error is without merit under our law.

2. Grounds for Termination
The question presented by the parents' second assignment of error is whether, on this review de novo on the record, we find that the evidence clearly and convincingly establishes, In re Interest of J.B. et al., 235 Neb. 530, 455 N.W.2d 817 (1990), the grounds for termination alleged by the State's petition and specifically by § 43-292(2), to wit, that the parents "have substantially and continuously or repeatedly neglected" their children and have "refused to give" them "necessary parental care and protection."
The answer is that the evidence does so establish. We have stated that parents may as surely neglect a child of whom they do not have possession by failing to put themselves in a position to acquire possession as by not properly caring for a child of whom they do have possession. In re Interest of C.D.C., supra. The parents have failed to provide an environment to which the children could return, and, as we have repeatedly stated, children should not be suspended in foster care, nor be made to await uncertain parental maturity. Id.

3. Best Interests of Children
The question inherent in the parents' third and final assignment of error is whether, on this de novo review, the evidence clearly and convincingly establishes that it is in the children's best interests that the parents' rights in and to their children be terminated.
Again, the answer is that it does. Because the children have lived with their foster family for nearly a decade, they have, as would be expected, bonded to their foster family and no longer have any emotional attachment to their natural parents. Visitations are harmful to the children, the children desire that the visitations be discontinued, and the children will acquire a much-needed sense of security if adopted by their foster parents.

IV. DECISION
It seems that much, although certainly not all, of the untoward delay in achieving a permanent legal resolution of this case rests with the social workers who decided to make no effort to reunify this family, but focused instead on making the children available for "open adoption." Under what authority did these employees of the state, who are neither elected nor appointed and are thus largely unaccountable to the citizenry, so decide? As noted earlier, one of the express purposes of the Nebraska Juvenile Code is "to assure every reasonable effort possible to reunite the juvenile and his or her family." § 43-246. Such has been the express policy of this state since July 12, 1974. See, 1974 Neb.Laws, L.B. 620; Neb.Rev.Stat. § 43-201.01(4) (Cum. Supp.1974).
That the failure of a juvenile court to specify a plan of rehabilitation does not necessarily prevent the termination of parental rights does not mean that the state's social workers are free to formulate their own public policy. Public policy is fashioned by the Legislature and reviewed by the judiciary. This principle of governance seems to have eluded the social workers connected with this case, one of whom testified that "[w]e still have to keep the kids' best interest in mind even if the court makes mistakes."
In view of the manner in which this case was handled, it is impossible to know whether these parents would ever have been able to acquire the skills required to enable them to provide their children with "necessary parental care and protection." However, the record does show that initially the parents were cooperative, responded positively to suggestions, and made an effort to do what they were told. It was after they, apparently through the passage of time, lost hope of ever being reunited with their children that they became unwilling to cooperate with the various social workers. The frustration generated in the parents by the approach used in this case is illustrated by the mother's response when *282 she was asked in April 1988, about 10 years after she was first brought into the juvenile justice system, why she missed a visit from a social worker. She stated that "they had been through this before ... it was a waste of time.... And so ... didn't want to go through it again." The record can be viewed as establishing that the parents were set up to fail so that the various social workers involved could fulfill their self-assigned goal of placing the children for adoption.
If, on the other hand, it was obvious to everyone connected with this case that the parents could never become adequate to take care of their children no matter how much help and guidance they were given, why did it take the State more than a decade to pursue termination of their parental rights, and why did the courts below not require that the case progress to final resolution at a reasonable rate?
Although this is an egregious case, it is by no means the only one in which children have been kept in the juvenile justice system far longer than seems necessary. E.g., In re Interest of A.G.G., 230 Neb. 707, 433 N.W.2d 185 (1988) (6 years); In re Interest of D.R. and S.B., 217 Neb. 883, 351 N.W.2d 424 (1984) (13 years). A juvenile justice system which permits children to languish in its grip for 12 years, as was done in this case, is seriously flawed; steps must be taken to assure that in the future children and families are treated as something more than raw material for the social services industry. See In re Interest of L.D. et al., 224 Neb. 249, 398 N.W.2d 91 (1986) (proceedings in juvenile court involve impressionable children in their formative years, not impersonal flotsam and jetsam adrift on a sea of indecision or, much worse, societal insensitivity or apathy).
Nonetheless, there being no merit under current law to the parents' assignments of error, we affirm the judgment below.
AFFIRMED.