IN RE INTEREST OF L.H., A.H., W.H., AND T.H., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. D.H., APPELLANT.
487 N.W.2d 279

Filed August 7, 1992.   Nos. S-91-598, S-91-599.

Mary C. Gryva, of Frank & Gryva, for appellant.

James S. Jansen, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

These two juvenile cases involving four children of the appellant, D.H., have been consolidated for briefing and argument in this court. Case No. S-91-598 concerns L.H., appellant's oldest child, and case No. S-91-599 concerns appellant's other three children, A.H., W.H., and T.H. After a long series of dispositional hearings, the juvenile court terminated appellant's parental rights in the children. D.H. appeals the orders of the juvenile court. We affirm.

## FACTS AND PROCEDURES

On March 6, 1985, the State filed a petition (case No. S-91-598) alleging that D.H.'s oldest child, L.H. (a daughter born out of wedlock on August 9, 1984), was a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984) because she lacked proper parental care by reason of the faults or habits of her mother. The State specifically alleged:

A. On or about February 18, 1985, said child was placed in protective custody because the whereabouts of [D.H.] were unknown.

B. On numerous occasions, said child has been left with relatives and non-relatives by [D.H.], for prolonged periods, without making prior arrangements, and her whereabouts are unknown during said absences.

C. [D.H.] suffers from a dependence upon alcoholic beverages which impairs her ability to provide the necessary parental care, protection and supervision required by said child.

The court entered an order placing temporary custody of the child in the Nebraska Department of Social Services (DSS), and

at the detention hearing on March 18, 1985, the court continued temporary custody in DSS and directed that visitation rights be established between the mother and child.

At the adjudication hearing on June 27, 1985, D.H. admitted the allegations contained in counts IIA and IIB of the petition. The court determined that it had jurisdiction by virtue of § 43-247(3)(a).

At a dispositional hearing held on August 14, 1985, attended by D.H. and her counsel, the court received four exhibits: a report containing a rehabilitation plan, a foster care report, a chemical dependency evaluation, and a home evaluation of D.H.'s uncle and aunt, who wanted to provide a home for L.H. The court also ordered a rehabilitative plan, which required the appellant to (1) regularly visit with L.H., (2) attend an inpatient alcohol treatment program, (3) obtain and maintain full-time employment, (4) obtain and maintain adequate housing, (5) attend the weekly Mother's Support Group Meetings, and (6) cooperate with the workers involved with the case.

A further hearing was held on February 14, 1986. The court concluded at the hearing that D.H. had not fully complied with the rehabilitation plan; she did not enter the inpatient alcoholism treatment program, but instead involved herself in outpatient counseling; she had not maintained full-time employment; she had not provided for adequate housing; and she had not entered the Mother's Support Group. The court changed the order concerning alcohol treatment in the rehabilitative plan, so that D.H. was ordered to participate in outpatient counseling at the North Omaha Alcoholism Counseling Center, and if necessary participate in an inpatient treatment program. The court renewed its order regarding the custody of L.H.

At the next review hearing on August 20, 1986, W.D. admitted being the father of L.H., and the court allowed him to intervene as a party. The record shows that D.H. still did not comply with the plan. She failed to visit L.H., to participate in the alcohol counseling, and to maintain stable housing. She had attended the Mother's Support Group only twice since the previous review hearing. The court renewed the custody order in DSS, and temporary physical custody of L.H. was placed

with D.H.'s uncle and aunt.

Another review hearing was held on February 20, 1987. The court noted that the appellant had entered an inpatient alcohol treatment program but did not comply with any of the other court orders. The court changed the rehabilitative plan and ordered D.H. to participate in inpatient alcohol treatment and to provide child care for A.H., her second child, during this treatment period. The order requiring D.H. to attend the weekly Mother's Support Group Meetings was deleted.

At a review hearing on June 16, 1987, the court noted some progress in D.H.'s rehabilitation. The appellant had completed the inpatient alcohol treatment program, and she was going to the South Omaha Alcoholism Counseling program. She paid regular visits to L.H. The court again changed the rehabilitation plan and ordered the appellant to participate in ongoing outpatient alcohol treatment, plus individual counseling sessions. Temporary custody of L.H. remained with DSS.

During the next hearing, on December 16, 1987, the court became aware of some domestic violence that occurred between D.H. and W.D., her boyfriend and L.H.'s father. In addition, the court noted that D.H. had started drinking again. The court included W.D. in the provisions of the rehabilitation plan and added an additional provision which ordered D.H. and W.D. to attend domestic violence counseling and couples counseling. In addition, the court ordered D.H. to attend Alcoholics Anonymous (AA) meetings and Women Against Violence counseling.

At the hearing on May 13, 1998, the court took notice of the facts that D.H. did not maintain stable housing, that there had again been some physical abuse between her and W.D., and that D.H. had not attended the domestic violence groups. The court ordered D.H. and W.D. to enter into chemical dependency and codependency treatment.

At the next review hearing, held on November 14, 1988, the evidence showed that since the preceding hearing, D.H. had missed three visits with L.H. and had attended only one chemical dependency or codependency group meeting. In addition, she had not participated in either domestic violence

groups or AA meetings.

During the next review hearing, on February 13, 1989, the court noted that D.H. still had not complied with the visitation orders, had not participated in the chemical dependency and codependency programs, and had not gone to the domestic violence counseling. The court ordered D.H. to attend relinquishment counseling.

On March 28, 1989, the county attorney filed a petition (case No. S-91-599) alleging that D.H.'s other three children, A.H. (a daughter born out of wedlock on June 7, 1986), W.H. (a son born out of wedlock on October 21, 1987), and T.H. (a daughter born out of wedlock on December 5, 1988), were juveniles under § 43-247(3)(a) (Reissue 1988) due to lack of care by reason of the faults or habits of their mother. The petition alleged:

> A. On or about March 10, 1989, [T.H.] was left with a caretaker for what was to be an overnight stay; [D.H.] had not returned as of March 13, 1989, when said child was taken into protective custody; the whereabouts of [D.H.] were unknown during this period.
>
> B. On or about January 27, 1989, said children were placed with a caretaker for what was to be an overnight stay; [D.H.] did not return for said children until February 11, 1989; [her] whereabouts were unknown during this time; [D.H.] had not provided money, food or clothes to meet said children's needs during [her] absence.

T.H. was taken into protective custody on March 13, 1989, and on March 28, 1989, the court ordered DSS to retain custody of T.H. for placement in a foster home.

A detention hearing regarding A.H., W.H., and T.H. was held on April 19, 1989, with the mother and her counsel present. D.H. did not resist the children's detention, and the court entered an order placing temporary custody of the three children with DSS. The court ordered a foster placement for T.H. and placed A.H. and W.H. in the physical custody of their mother.

At a review hearing held for L.H. on June 2, 1989, the court took notice of the fact that D.H. and W.D. had made only one visit to L.H. through Child Protective Services (CPS) since

April 14, 1989, but that they had visited L.H. on their own at her foster home. D.H. had attended the orientation session and two programs of the chemical dependency and codependency treatment. D.H. indicated that she had attended eight AA meetings, but she did not show proof of an AA card. She had not attended any relinquishment counseling.

On November 14, 1989, the court held an adjudication hearing regarding A.H., W.H., and T.H. D.H.'s aunt testified that on about January 27, 1989, D.H. asked her to babysit A.H., W.H., and T.H. for a weekend. D.H. returned 15 days later. Her aunt had not known where she was. D.H. had not provided her aunt with enough supplies for the children. Her aunt also did not know the whereabouts of W.D. A babysitter testified that D.H. brought T.H. over to her house in March 1989 and asked her whether she could take care of the baby for one night. D.H. brought her baby supplies for 1 day. D.H. did not return for her baby, and the babysitter was not aware of her whereabouts. D.H. never called to ask about her baby. The babysitter turned the baby over to the police on March 13, 1989. D.H. testified that she left her children with her aunt because she wanted "some space to try to find myself." She stated that she did not intend to leave for 2 weeks. She spent her time away cleaning the house, buying a bed for the children, and talking to friends. She testified that she was working as a nurse's aide. She admitted leaving T.H. at the babysitter's house. She denied having a habit of leaving her children at other people's houses. D.H. stated that W.D. is not the father of the three youngest children. The court granted the State's motion to strike W.D.'s name from the petition. The court adjudicated the children to be children within the meaning of § 43-247(3)(a).

A disposition hearing was held on December 20, 1989, concerning A.H., W.H., and T.H. The record indicates that D.H. had not made herself available to the probation officer and CPS. The court ordered D.H. to (1) visit her children through DSS on a regular basis; (2) provide adequate medical care and supervision, along with a chemical-free and safe environment, for her children A.H. and W.H., who remained in her home; (3) attend ongoing treatment for codependency and chemical dependency; (4) maintain stable and adequate

housing which is kept clean; (5) attend a domestic violence group; (6) maintain adequate and stable income and provide proof thereof; (7) attend two AA meetings per week and show proof of attendance; and (8) cooperate with all workers on the case.

On January 22, 1990, the court, on its own motion, ordered that custody of A.H. and W.H., the two children still residing with the mother, be placed with DSS. The court held a detention hearing on February 9, 1990. Betty Burton, a CPS worker assigned to the case, testified that on January 12, 1990, A.H. and W.H. had been left with an uncle. The uncle had brought the children to the home of the aunt who had custody of L.H. The court ordered a temporary placement of the children in the aunt's home. The court took notice of the fact that D.H. was working, staying in touch with CPS, maintaining a stable place of residence, and carrying out the other portions of the court's order. The court ordered that DSS retain legal custody of the children but that A.H. and W.H. be placed with the mother. The court also ordered D.H. not to leave the children with anyone without approval of the CPS officer.

The court held a review hearing regarding the three youngest children on March 19, 1990. The record shows that D.H. had been keeping a clean house, that she had been caring for the two children, and that she had been employed. In addition, D.H. had started participating in a domestic violence group and the AA meetings. She had not yet attended the chemical dependency and codependency groups. The mother had only visited the children with DSS personnel once at the foster home since December 20, 1989, although she did visit T.H. on her own, without permission. The court ordered T.H. to be placed with her mother.

Another review hearing was held for L.H. on June 13, 1990. The evidence shows that D.H. and W.D. still failed to fully comply with the court orders.

On July 15, 1990, the State took protective custody of A.H., W.H., and T.H., pursuant to Neb. Rev. Stat. § 43-248(3) (Reissue 1988), and the court ordered detention of the children because continuation of the children in their home would be contrary to their welfare. Apparently, the mother again left her

children with her aunt and other caretakers for extended periods of time, which resulted in D.H.'s conviction for child abuse on July 16, 1990. The record also shows a shooting incident between D.H. and W.D.

On July 24, 1990, the court ordered a further detention of the children and sustained D.H.'s counsel's motion to withdraw.

Another review hearing for the three youngest children was held on October 17, 1990. The court found at the hearing that D.H. still had not complied with the court orders and that the children could not be returned to her. D.H. had not attended the domestic violence group and the chemical dependency and codependency sessions. D.H. claimed to have attended AA meetings but did not show any proof.

On December 5, 1990, the State filed a motion for termination of the parental rights between D.H. and her four children, L.H., A.H., W.H., and T.H., based on Neb. Rev. Stat. § 43-292 (Reissue 1988), which states in part:

> The court may terminate all parental rights between . . . the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

A hearing on the motion to terminate the parental rights was held on May 9, 1991, with D.H. present in person and with counsel. The testimony shows that D.H. had not successfully completed the chemical dependency and codependency treatment; she had lived in 18 different residences since 1985; she had never fully participated in the domestic violence group, despite the fact that there was much violence between D.H. and W.D.; she had not maintained a stable income; she had attended AA meetings on only an irregular basis and had not always provided proof of attendance; she had left her three youngest children at other people's residences for extended

periods of time and was charged with three counts of child abuse as a result of that; she had not provided her children with adequate care and supervision; she had not kept in contact on a regular basis with officers assigned to the case; and she had often not made scheduled visits to L.H. In her own defense, D.H. testified that she had lived at 7 or 8 locations, not 18.

The court terminated D.H.'s parental rights to all four children on May 15, 1991. D.H. timely appealed to this court and assigns as error (1) the trial court's act of taking judicial notice of and admitting into evidence exhibits submitted on August 14, 1985, which contain hearsay and were received without a hearing; (2) the trial court's finding that there was clear and convincing evidence to support the termination of her parental rights; (3) the trial court's finding that the children were juveniles under § 43-247(3)(a) and that reasonable efforts have failed to correct the conditions leading to the determination; and (4) that the court's order to terminate the parental rights was contrary to law.

## SCOPE OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 701-02, 484 N.W.2d 68, 69 (1992).

## JUDICIAL NOTICE

In her first assignment of error, D.H. argues that the juvenile court, during the termination hearing, erred in taking judicial notice of exhibits offered at the August 14, 1985, hearing. From D.H.'s argument, it appears this error is based on a claim that the August 14 dispositional hearing did not take place; consequently, the four exhibits were not properly a part of the record and a part of the State's motion for judicial notice, and

therefore, the mother did not have an opportunity to either object to or cross-examine the authors of the exhibits, amounting to a denial of her due process rights.

Concerning the alleged August 14, 1985, hearing, the bill of exceptions for that date includes only the four exhibits, with one exhibit bearing the typed notation: "No Hearing was held. Reports submitted." The transcript includes a signed court order of a hearing held on August 14, 1985, attended by D.H. with counsel; it shows that the exhibits were received into evidence and that the court entered a rehabilitation order with terms, which order was subject to review in 6 months. The bill of exceptions shows that reference was made during the February 14, 1986, hearing to a hearing held on August 14, 1985.

We assign no verity to the typed notation on the exhibit, and conclude that a dispositional hearing was held on August 14, 1985, attended by D.H. with counsel, and that the four exhibits were part of the court records and therefore exhibits in case No. S-91-598.

At the consolidated termination hearing, attended by D.H. with counsel, the State moved the court to take judicial notice of the court's own records, exhibits, and orders, using the language found in *State v. Norwood*, 203 Neb. 201, 277 N.W.2d 709 (1979). No objection being made, the court agreed to the motion.

At issue here are the following four summarized exhibits from case No. S-91-598: (1) a report to the court, dated August 2, 1985, and drafted by Anna Foster, a DSS service officer; Burton, the CPS worker; and David Stickman, the guardian ad litem, which report proposed a rehabilitation plan that was generally adopted at the hearing; (2) a printed form, dated July 9, 1985, of a foster care case plan review with recommendations by Burton; (3) a chemical evaluation of D.H., dated July 16, 1985, by Barbara Preston, counselor; and (4) a home evaluation, dated June 17, 1985, concerning the home of D.H.'s aunt and uncle in Omaha, Nebraska, prepared by Linda Hruska of DSS. All these exhibits were clearly hearsay evidence and subject to objection if promptly made.

"The requirements of due process control a proceeding to

terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that the parental rights should be terminated." *In re Interest of P.D.*, 231 Neb. 608, 616, 437 N.W.2d 156, 162 (1989). "In proceedings to terminate parental rights under the Nebraska Juvenile Code, a parent has the due process right to cross-examine an adverse witness." *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 265, 417 N.W.2d 147, 157 (1987). The concept of judicial notice of disputed allegations has no place in hearings to terminate parental rights. *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992). "[I]n proceedings to terminate parental rights, reports may not be received in evidence for the purpose of that proceeding, nor otherwise relied upon by the court, unless they have been admitted without objection or brought within the provisions of Neb. Rev. Stat. § 27-803(22) (Reissue 198[9]) . . . ." *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 705, 414 N.W.2d 266, 269 (1987).

> " 'If when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, or fails to object, or to insist upon a ruling on an objection to the introduction of such evidence, and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, and the evidence is in the record for consideration the same as other evidence.' "

*In re Interest of E.G.*, 240 Neb. 373, 380, 482 N.W.2d 17, 22 (1992).

Since the failure of D.H.'s counsel to object to the judicial notice motion constituted a waiver of her rights to cross-examine the authors of the exhibits, the court did not commit a procedural error in granting the motion to take judicial notice of the documents. Absent a showing to the contrary, it is presumed that the trial court disregarded all incompetent and irrelevant evidence. See *State v. Duran*, 204 Neb. 546, 283 N.W.2d 382 (1979).

Further considering D.H.'s first error claim, it must fail for two reasons. First, the improper admission of evidence by the trial court in a parental rights termination proceeding does not, in and of itself, constitute reversible error; a showing of

prejudice must be made. *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990). D.H. failed to show that the inclusion of the exhibits in the evidence was prejudicial to her due process rights. Secondly, because

> factual questions concerning a judgment or order terminating parental rights are tried by an appellate court de novo on the record, impermissible or improper evidence is not considered by the appellate court. In an appeal from a judgment or order terminating parental rights, the appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code.

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 710, 484 N.W.2d 68, 74 (1992). The first assignment of error fails.

## § 43-247(3)(a)

Next, D.H. assigns as error the juvenile court's finding that her children were juveniles within the meaning of § 43-247(3)(a). This assignment of error will not be considered, since D.H. has not discussed this assignment in her brief. " '[C]onsideration of the case will be limited to errors assigned *and* discussed.' " *In re Interest of C.W. et al.*, 239 Neb. 817, 832, 479 N.W.2d 105, 116 (1992).

## CLEAR AND CONVINCING EVIDENCE

In her next assignment of error, D.H. argues that the decision of the juvenile court terminating her parental rights was not supported by clear and convincing evidence.

D.H. claims that she did substantially comply with the rehabilitation plan and that any noncompliance did not indicate a willful disregard for the court order.

A parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation designed to reunite the parent and child presents an independent reason justifying termination of parental rights under § 43-292(6). *In re Interest of B.B. et al.*, 239 Neb. 952, 479 N.W.2d 787 (1992). When a rehabilitation plan is implemented, the plan must be reasonable and conducted under the direction of the juvenile court before

failure to comply with the plan can be an independent reason for termination. See *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988).

In order to terminate parental rights pursuant to subsection (6) of § 43-292, the State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. *In re Interest of S.B.E. et al.*, 240 Neb. 748, 484 N.W.2d 97 (1992); *In re Interest of L.C., J.C., and E.C.*, 235 Neb. 703, 457 N.W.2d 274 (1990). We begin by considering the plan and the mother's performance with respect to it.

Regarding parental noncompliance with a court-ordered rehabilitative plan as a ground for termination of parental rights under § 43-292(6), the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

"Materiality of a provision in a court-ordered rehabilitative plan is determined by a cause-and-effect relationship: Does a provision in the plan tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code?" *In re Interest of J.S., A.C., and C.S.*, 227 Neb. at 268, 417 N.W.2d at 158. Materiality regarding a rehabilitative plan exists when a parent's noncompliance results in a continued condition which was the basis for the adjudication and which is deleterious to a child expected to benefit from parental compliance with the rehabilitative plan. *In re Interest of J.S., A.C., and C.S., supra*.

The foremost purpose and objective of the Nebraska Juvenile Code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. *In re Interest of D.L.S., supra*. Where a parent is unable to rehabilitate herself within a reasonable time, the best interests of the children require

termination of the parental rights. *In re Interest of J.H. et al.*, 233 Neb. 338, 445 N.W.2d 599 (1989); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990).

With regard to the provision requiring D.H. to visit her children on a regular basis through DSS, that provision was material and D.H. did not fully comply with it. The record shows that D.H. and W.D. seldom visited L.H. through DSS, although contrary to the court order they visited L.H. at the foster home. The record also indicates that D.H. did not consistently visit her other three children after they were put in protective custody.

Concerning the provision requiring D.H. to participate in ongoing treatment for codependency and chemical dependency, it was never fully met. D.H. attended only the orientation session and two programs. This provision was material, since it was designed to assist D.H. with her alcoholism problem and domestic abuse.

With regard to the provision ordering treatment for alcohol addiction, the record shows that D.H. attended AA meetings on an irregular basis, and she did not provide proof of attendance, even though this was required. Appellant contends the State has to show proof of willful noncompliance with the rehabilitative plan in order to terminate the parental rights under § 43-292(6). She argues that the State did not meet this burden of proof, since the record shows examples of her substantial compliance. As an example, she points out her attendance at various alcohol programs, including a successful completion of inpatient treatment. However, this court has held:

> "[T]he fact of participation in certain elements of the court-ordered plan does not necessarily prevent the court from entering an order of termination where the parent has made no progress toward rehabilitation. A parent is required not only to follow the plan of the court to rehabilitate herself but also to make reasonable efforts on her own to bring about rehabilitation."

*In re Interest of M.*, 235 Neb. 61, 68, 453 N.W.2d 589, 593 (1990).

Thus, the fact that D.H. partially complied with one

provision of the rehabilitative plan does not prevent termination of her parental rights.

The record also shows that D.H. did not maintain stable and adequate housing, since she changed residences 18 times since 1985. This provision is also material in that it was designed to provide a stable home for the children upon their return.

The provision with regard to the domestic violence group was also never met. D.H. argues that she never understood what the domestic violence group was to address and questions the materiality of the provision. D.H.'s argument has no merit, since the record indicates that D.H. had been physically abused by W.D. on several occasions and that D.H. had shot W.D. in his hand.

D.H. also did not fully comply with the provision that required her to maintain adequate and stable income. The record indicates that D.H. had been engaged in several short-term employments. She worked at a McDonald's restaurant from April until June 1988. She drove a schoolbus from January until April 1990. She started receiving Aid to Dependent Children in May 1990, which was cut off in July when her children were removed from her home. She worked at a Little King restaurant from August until she was fired in September 1990. Subsequently, she was allegedly employed by Kentucky Fried Chicken from September until October 1990, but the fast-food restaurant did not confirm this information. Finally, D.H. was employed by a Wendy's restaurant at the time the motion to terminate the parental rights was filed in December 1990. This provision is material, since its purpose was for D.H. to be able to provide a living for four children upon reunification.

The record also indicates that D.H. did not always cooperate with the workers on the case. The workers have on occasion had difficulties locating D.H., and her whereabouts have not always been known. Several times D.H. also failed to make contact with the officers and did not give notice of a change of residence.

The rehabilitation plan for the case concerning the three youngest children included a provision requiring D.H. to provide adequate medical care and supervision, along with a

chemical-free and safe environment, for her children. D.H. argues that no evidence was presented at the termination hearing to prove that there was any problem with medical care and supervision. The record shows that the purpose of this provision was to prevent D.H. from leaving her children with other people for an extended period of time. D.H.'s children were staying with various people in June and July 1990, and as a result, D.H. was convicted of child abuse on July 16, 1990. The record shows D.H.'s noncompliance with this provision.

D.H. was provided with a reasonable opportunity to rehabilitate herself according to the court-ordered plans and failed to do so. The order terminating the parental rights of D.H. to her four children, supported by clear and convincing evidence, should be affirmed.

## BEST INTERESTS OF CHILDREN

Finally, D.H. assigns as error the court's finding that termination of D.H.'s parental rights was in the best interests and for the welfare of the minor children.

The evidence in this case underscores three glaring concerns with D.H.'s parental ability: use of alcohol, failure to provide a stable home, and lack of supervision. The rehabilitation plans reflect the court's and DSS' attempts to eliminate or at least reduce these problems.

" 'Where a parent fails to rehabilitate herself within a reasonable period of time, the best interests of the child may require that a final disposition be made without delay.' " *In re Interest of M.*, 235 Neb. 61, 68, 453 N.W.2d 589, 593 (1990). Accord *In re Interest of B.B. et al.*, 239 Neb. 952, 479 N.W.2d 787 (1992).

D.H. had the habit of leaving her children with other caretakers for extended periods of time. D.H. moved the children from one caretaker to another while the children were in her court-ordered care. She did not regularly make the scheduled visits with her children after they were placed in a foster home. There is evidence that the children became upset when D.H. visited them on her own account at their foster address and told them that they would be coming home. In addition, the evidence contains incidents of domestic violence,

including two shootings.

The evidence shows, clearly and convincingly, that D.H. has failed and neglected to provide her children with a stable home. The rehabilitation plans were designed to reunite D.H. with her children, and they were in all respects reasonable. The only alternative to termination of parental rights is continued efforts to rehabilitate by DSS, while the children remain in foster homes.

L.H. has been under the jurisdiction of the court since 1985 and her siblings since 1989. Children cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of P.D.*, 231 Neb. 608, 437 N.W.2d 156 (1989).

The judgments of the juvenile court terminating the mother's parental rights are affirmed.

AFFIRMED.